STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JAMES EDWARD HILL, DEFENDANT-APPELLANT.

Argued January 25, 1966—Decided July 7, 1966.

*Mr. Paul G. Levy* argued the cause for defendant-appellant.

*Mr. John J. Barry,* First Assistant Prosecutor of Mercer County, argued the cause for plaintiff-respondent. (*Mr. Vincent Panaro,* Prosecutor of Mercer County, attorney).

The opinion of the Court was delivered by

Schettino, J. Defendant appeals as of right, *R. R.* 1:2–1(c), from a judgment of conviction of murder in the second degree and a sentence of 15 to 20 years in the State Prison. He was indicted under a short form murder indictment by the Mercer County Grand Jury for the killing of one Anita Folk of 143 South Stockton Street, Trenton.

The victim, an ex-girl friend of defendant by whom she had a child, was found on Sunday morning, November 10, 1963 by Ethel Hankins, who lived in an apartment adjacent to and to the rear of Anita's. In fact, the rear entrance of Anita's apartment opened into Ethel's so that anyone who desired to gain entry to Anita's apartment from the rear would be required to pass through Ethel's. It was Ethel's custom to go into Anita's apartment each morning and have coffee with her. According to her statements to the investigating officers and at the trial, on this particular morning she called for Anita and, receiving no response, went in through the open kitchen door. She found Anita lying on her bed, clad in a slip, appearing to be unconscious. Ethel then called Mildred Jackson, the defendant's sister, who lived in a second floor apartment in a building adjacent to Anita's. Both were unsuccessful in rousing Anita and thereupon called the police.

When they arrived, the officers found the lock to the door of Anita's apartment had been broken, the door bearing evi-

dence that it had been forced open. They also found both on and near the bed a man's belt which appeared to be slashed and cut.

Questioning of Ethel and Mildred brought out the following information from them. Ethel stated that Anita had come in through her apartment at about 6:30 or 7:00 P. M. the night before. She was accompanied by a man whom Ethel could not identify. She was not sure of his description, as she stated she was in bed at the time and had not had a chance really to get a good look at him as Anita and he merely passed through.

Mildred told the police that at about 9:00 P. M. she was playing cards with a friend, Hilda Patman, in a second floor apartment at the Stockton Street residence when she heard someone calling from the first floor asking her to come down to Anita's apartment. Mildred went to Anita's apartment and found Anita crying. She testified that her brother, the defendant, was there, that defendant "smacked" Anita but that when Mildred asked them if they were fighting, both said "no." She saw Anita headed toward the bathroom crying. Mildred said that that was the last she saw Anita alive. She testified further that it was Arthur Hames who she knew was with defendant who had called her to come down.

An autopsy was performed that afternoon by Dr. Mathew Lapin, a deputy Mercer County physician, who determined that the cause of the death was due to a subdural and subarachnoid hemorrhage of the brain. Dr. Lapin testified that such hemorrhages are normally caused by an external force accompanying a blow to the head. Dr. Lapin was further of the opinion that the hemorrhage was recent, and that death had occurred within 30 minutes to an hour of the time of the causal blow.

Defendant was apprehended that same Sunday evening at 6:00 P. M. He denied any implication in Anita's death and gave the police a written statement that evening. In the statement, taken in narrative form, he claimed that he had seen Anita that Saturday afternoon outside a tavern, that he

questioned her concerning a swelling and bruise on her head and that she told him to mind his own business. He denied being at Anita's apartment that Saturday night. On the following Tuesday, he gave a second written statement to the police in which he stated that his first statement was untrue, that he had been to Anita's apartment at approximately 8:30 P. M. or 9:00 P. M. on Saturday night and that he had slapped her. He claimed however, that when he left that night she was in good health and had gone to bed.

The State's principal witness at the trial was Arthur Lee Hames, the defendant's companion on that Saturday night. He testified that he and the defendant were drinking together at Scottie's Bar on Stockton Street and that at about 8:00 P. M., the defendant suggested going over to Anita's house, and Hames agreed. The defendant left about five minutes ahead of Hames. Upon his arrival there, Hames found the door "busted" open and went in, and saw the defendant standing over the bed brandishing a knife at a man later identified as Harold Warren who was in bed with Anita. At the moment of Hames' arrival, Warren jumped up and was chased out of the apartment by Hill. Hames said he followed Hill after Warren for a short distance.

Shortly thereafter both returned. Hames went into the hall to call Mildred telling her that defendant and Anita were fighting. When he re-entered Anita's apartment, he said he saw Hill kick Anita in the neck while she lay in bed and that when Anita started getting up Hill hit her over the head with a chair. Anita screamed and began to cry and at that moment Mildred appeared. Then Hill "smacked" Anita on the side of the face.

While Mildred helped Anita into the bathroom, Hill began to slash and cut up Warren's clothes. Hames testified that at this time one Lena Jones entered and took Warren's coat upstairs to Mildred's apartment. At this point Hames left, leaving Hill then standing next to the bed to which Anita had returned. His last view of Anita alive was while she was in bed crying.

Warren testified that he had met Anita that afternoon and the two had made the rounds of various local bars, finally returning between 6:00 and 7:00 P. M. to Anita's apartment entering through the rear apartment. Warren claimed that he and Anita each had a beer a piece, went to bed, and thereafter fell asleep and that the next thing he remembered he was being slapped awake by Hill. Warren further stated that Hill brandished a knife at him and being afraid he ran out of the apartment clad only in his shorts and undershirt. He identified the cut-up belt as his and also the coat which was turned over to the police by Lena the next day.

Another witness for the State, Hilda Patman, the defendant's girl friend at the time of the incident testified that she was with Mildred when they heard the screams from downstairs. When she reached the stairwell, she saw a man run out of Anita's apartment clad in his shorts being chased by Hill. She also testified that she found a bloody handkerchief on her bureau. She said that apparently Hill had put it there. This handkerchief was subsequently put in evidence.

The defendant took the stand in his own behalf. Although the State did not in its case refer to any statement given by the defendant, defendant nevertheless opened the subject. He testified that the first statement he gave to the police was involuntary and untrue but he claimed the second statement where he admitted slapping Anita was true. Although he agreed with Hames' testimony in most particulars, he denied ever kicking Anita in the neck and also hitting her with the chair. He claimed that he chased Warren for the fun of it and also that the clothes he cut up were his own left there from the time two months ago when he last had been with Anita.

I.

Defendant contends that the State failed to sustain its burden of proving the *corpus delicti* in that it failed to show that the victim's death occurred as a result of some criminal agency. Defendant argues that although the fact of death was

proved and the cause thereof was shown—a subdural and subarachnoid hemorrhage resulting from an external blow— the State, by failing to ask its medical expert by use of a hypothetical question whether the striking of the victim's head with a chair could cause such a result, left the jury to conjecture over whether the force and intensity of such a blow could in fact cause such injury.

 Proof of the *corpus delicti* is required in all criminal cases. *State v. Geltzeiler,* 101 *N. J. L.* 415 (*E. & A.* 1925). As stated in *State v. Lucas,* 30 *N. J.* 37, 53 (1959) there are three basic elements in the proof of a crime: (1) the occurrence of loss or injury, (2) criminal causation of that loss or injury and (3) the identity of the defendant as the perpetrator of the crime. However, it is firmly established in this State that the term *corpus delicti* embraces only the first two of these elements—loss or injury and criminal causation. *State v. Portee,* 46 *N. J.* 239 (1966); *State v. Greely,* 11 *N. J.* 485 (1953); *State v. Gleitsmann,* 62 *N. J. Super.* 15 (*App. Div.*), certif. denied 33 *N. J.* 386 (1960), 7 *Wigmore, Evidence* (*3d ed.* 1940) § 2072, *p.* 401. Notes, 13 *Vand. L. Rev.* 561 (1960); 103 *U. Pa. L. Rev.* 638 (1955).

 Thus the term *corpus delicti* is not and should not be a shorthand way of attacking the sufficiency and the weight of the State's proof concerning the manner and means by which the crime was committed. It is clear that the *corpus delicti* is proved where the State, *aliunde* a confession, has produced facts and circumstances from which the jury can infer that a loss has occurred and that that loss was caused by or was a result of a criminal act. *State v. Lucas, supra; State v. Greely, supra.* See 41 *C. J. S. Homicide* § 312, *p.* 16.

In *Greely,* defendants were indicted for murder, the State's theory being that they had beaten and robbed the victim in a men's room, the beating resulting in the injuries from which the victim died. The State offered medical testimony which showed that the cause of death was a massive hemorrhage in the areas where the victim had been beaten. There was further introduced the testimony of two witnesses that

they found the victim on the floor of the men's room in a "stretched out" position as if he was "asleep on the floor." The defendants disputed the intensity of the blows and further disputed the fact of injury. The Court rejected the defendant's contention that the State had failed in sustaining its burden of proof of the *corpus delicti* (11 *N. J.,* at *p.* 492) :

"If in a robbery the victim was thrown to the floor with sufficient force to render him unconscious or semi-unconscious, *inferrable* from the fact that he was 'stretched out' and 'asleep on the floor,' and there was medical testimony that he sustained an injury from which he subsequently died, there is sufficient [evidence] to create a *prima facie* case against the defendants. Here the medical testimony plus the physical facts, sustains the State's case and requires its submission to a jury." (Emphasis added)

■ In the instant case, even stronger proof of criminal agency was presented. The State's doctor testified to the fact of subdural and subarachnoid hemorrhage. He was further of the opinion that such hemorrhages as a matter of fact are usually caused by blows to the head. Arthur Lee Hames testified to the fact that Hill had hit Anita in the head with a chair, that he had kicked her and had "smacked" her in and around the head. Another witness, Mildred Johnson substantiated the "smack" and testified further that Anita appeared "woozy" as if she were drunk and had to be helped into the bathroom and back to bed. The jury could easily have concluded from this direct testimony and could have inferred from the broken chair or from the force of the "smack" that the injury was caused by a criminal act. In such a case, the issue was properly submitted to the jury who were required first to find the loss and the criminal act and together with the weight of all the other evidence determine whether the defendant had committed a crime of homicide and if so to what degree.

## II.

We do not find that the prosecutor's comments upon the autopsy report not offered in evidence was prejudicial. See,

*State v. Reynolds,* 41 *N. J.* 163, 1 *A. L. R.* 2d 1438 (1963), *certiorari* denied 377 *U. S.* 1000, 84 *S. Ct.* 1934, 12 *L. Ed.* 2d 1050 (1964); *State v. Welsch,* 29 *N. J.* 152 (1959); *State v. Siciliano,* 21 *N. J.* 249 (1956); *State v. D'Ippolito,* 19 *N. J.* 540 (1955). *Cf. Berger v. United States,* 295 *U. S.* 78, 55 *S. Ct.* 629, 79 *L. Ed.* 1314 (1935); *State v. Johnson,* 31 *N. J.* 489, 509–513 (1960).

Proof of the State's theory consisted of Arthur Hames' testimony that he saw Hill hit Anita over the head with a chair and Dr. Lapin's testimony that the hemorrhage could be caused by an external blow. To overcome the testimony of Dr. Lapin, the defendant produced his own medical expert, Dr. Thomas Rathmell, who because he had not performed an autopsy himself testified upon the basis of Dr. Lapin's autopsy report. Dr. Rathmell was of the opinion that the hemorrhage of this type normally occurs when the head strikes a hard flat surface, such as the floor or a staircase, or as the result of a blow on the head while it is held in a rigid position such as when a boxer holds on to the back of his opponent's head while striking the front of the head with the other hand.

The State upon cross-examination asked Dr. Rathmell whether he agreed with the autopsy report of Dr. Saul Weintraub, a specialist called in by the State to perform a second autopsy the day after Dr. Lapin performed his. Dr. Weintraub's report had placed the time of death at sometime between 9 and 10 P. M.

Dr. Rathmell responded that he agreed with Dr. Weintraub's report in every particular. When asked whether he therefore agreed with Dr. Weintraub's conclusion that death occurred sometime between 9 and 10 P. M., Dr. Rathmell answered that he did and further that his testimony in all respects was based upon Dr. Weintraub's and Dr. Lapin's reports. Defendant at no point objected to this cross-examination nor did he pursue the matter on re-direct.

On summation, the defendant sought to disparage the effect of Dr. Weintraub's conclusions by questioning both his ab-

sence and the absence of the report itself in evidence. The prosecutor's summation included the fact that Dr. Rathmell, defendant's own witness, testified that he agreed with Dr. Weintraub's report and twice referred to the report's other aspects.

 It is fundamental that counsel in summation may discuss and comment only upon facts shown or reasonably inferable from the evidence. *State v. Bogen,* 13 *N. J.* 137, 139 (1953) ; 6 *Wigmore, Evidence* (3d ed. 1940), § 1806, *p.* 249; 5 *Wharton, Criminal Law and Procedure* (1957), § 2082, *p.* 241. The prosecutor is entitled to sum up the State's case graphically and forcefully as long as his argument is confined to facts in evidence or upon the reasonable inferences therefrom.

We have held that, where otherwise defendant has received a fair trial, if an issue is raised as to whether an improper comment requires a reversal, a reviewing court should consider whether trial counsel made timely and proper objection and whether the trial judge took appropriate action by instructing the jury and cautioning them to disregard the comment or insertion. *State v. Johnson,* 31 *N. J.,* at *p.* 511; *State v. Bogen, supra; State v. Vaszorich,* 13 *N. J.* 99, 119 (1953). These safeguards eliminate any possible prejudice by giving counsel and the court an opportunity to overcome the deleterious effect of the remark. *State v. Bucanis,* 26 *N. J.* 45, 57, 73 *A. L. R. 2d* 760 (1958) ; *State v. Orecchio,* 16 *N. J.* 125, 140 (1954).

██ Defendant made no objection to the cross-examination which elicited the fact that Dr. Weintraub's report placed the time of death at between 9 and 10 P. M. His first objection came when upon summation the prosecutor commented upon the fact that defendant's own witness concurred with Dr. Weintraub's report. However, it is clear that the trial court had cautioned the jury against accepting as true facts mentioned by either counsel in their openings or summations. Upon defendant's objection, the court again cautioned the jury that counsel's statements were only argument. Finally,

when instructing the jury the court again reiterated that statements of fact by counsel were not in evidence but that the jury was to base its findings on the testimony of the witnesses and the documents and items offered in evidence. The fact of Dr. Weintraub's findings on time of death was in evidence through the testimony of a defense witness and therefore subject to reasonable comment. In such a situation we find no merit in defendant's claim of prejudice.

## III.

Arthur Hames testified over objection that the defendant had accosted him at Scottie's Bar the first evening after the trial had begun. According to Hames, Hill threatened him, to prevent him from testifying against Hill. Hill allegedly told Hames: "I already killed one and would kill another" if Hames took the stand against him. The prosecutor after *voir dire* and while the jury was recessed, requested the court to caution Hill against further threats. At this time the prosecutor indicated that he would present the threat testimony at the trial whereupon the defendant objected and the matter was continued until Hames took the stand.

When the prosecutor sought to introduce the testimony at that time, an extended hearing was held as to its admissibility quite properly in the absence of the jury. The State claimed that the statement was relevant and admissible as probative of a consciousness of guilt. The defendant countered that the statement was equally probative of consciousness of innocence and that it was therefore inadmissible. The defendant further claimed that the highly prejudicial nature of the statement made it inadmissible.

The weight of authority supports the State's contention that threats made to a witness with the intent to induce him to stay away from a trial or not to appear to testify against the accused are admissible in evidence under a theory that any conduct of the accused inconsistent with his claim of innocence is admissible in evidence. *State v. Mason, 394 S. W. 2d*

343 (*Mo. Sup. Ct.* 1965); *Phillips v. United States,* 334 *F. 2d* 589 (9 *Cir.* 1964); *Baimbridge v. State,* 171 *Tex. Cr. R.* 395, 350 *S. W. 2d* 923 (*Tex. Crim. App.* 1961); *Collier v. Commonwealth,* 339 *S. W. 2d* 167 (*Ky. Ct. App.* 1960); *People v. Bloom,* 370 *Ill.* 144, 18 *N. E. 2d* 197 (*Sup. Ct.* 1938); 2 *Wigmore, Evidence* (*3d ed.* 1940) §§ 277, 278, *pp.* 119–125; 1 *Wharton, Criminal Evidence* (*12th ed.* 1955), § 208, *p.* 429; Annot. "Evidence As To Threats Made to Keep Witnesses Away From Criminal Trial," 62 *A. L. R.* 136 (1929). But see *Cobb v. State,* 20 *Ala. App.* 3, 100 *So.* 463 (*Ct. App.* 1924). Although no case in our jurisdiction has dealt with the admissibility of threats under theory of conduct inconsistent with a claim of innocence, there are cases holding that flight from the police, *State v. Garcia,* 83 *N. J. Super.* 345 (*App. Div.* 1964); *State v. Petrolia,* 45 *N. J. Super.* 230 (*App. Div.* 1957), and cases cited, that destruction of evidence, *State v. DeFalco,* 8 *N. J. Super.* 295 (*App. Div.* 1950), and concealment of crime, *State v. Neary,* 106 *N. J. L.* 104 (*E. & A.* 1930), are admissible as such evidence. See *State v. Reed,* 62 *N. J. Super.* 303 (*App. Div.* 1960), reversed on other grounds 34 *N. J.* 554, 91 *A. L. R. 2d* 797 (1961); *State v. Young,* 97 *N. J. L.* 501 (*E. & A.* 1922); *State v. Jaggers,* 71 *N. J. L.* 281 (*E. & A.* 1904). These cases in principle would support the action of the trial court.

 Nor do we find prejudice from the publication of the threat in a local newspaper prior to its introduction in evidence. Defendant has not shown that the jurors in fact read the newspaper account or were influenced by it. *State v. Trantino,* 45 *N. J.* 37 (1965), *certiorari* denied 382 *U. S.* 993, 86 *S. Ct.* 573, 15 *L. Ed. 2d* 479 (1966). Nor was the publication a result of improper conduct by counsel. *State v. Van Duyne,* 43 *N. J.* 369, 383 (1964), *certiorari* denied 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed. 2d* 279 (1965). Rather, the publication resulted from a reporting of events in open court when the prosecutor requested the court to caution defendant against any further threats to witnesses. The article itself referred to the threat factually and did not contain the

damaging admission or any inculpatory or inadmissible statements. Thus possible prejudice was minimal, corrected in any event by the introduction of the threat testimony into evidence. *State v. Trantino, supra,* 45 *N. J.,* at *p.* 40.

## IV.

 Defendant also contends that the two written statements were improperly admitted in evidence. After the State had rested its case, the defendant took the stand, ostensibly to testify only in respect to the alleged threat he made to Hames. However, the defendant proceeded to give his version of the incident as summarized above. During the questioning by his counsel, Hill claimed that he was coerced by the investigating officers in giving the two statements. This is the first reference before the jury to the written statements.

The defendant testified that he was apprehended by the police at about 6:00 P. M. on Sunday night, November 10, 1963, and was taken to the First Precinct station in Trenton. Upon his arrival there, the officers (whom Hill had difficulty in identifying at trial) asked him why he beat Anita with a chair and with his fists. Hill claimed that when he denied the beating, the officers threatened him with a murder charge and no bail, and, being afraid, he gave them his first written statement denying his presence at Anita's apartment on the night she was killed. In this first statement, Hill claimed that he met Anita outside a bar on Stockton Street that Saturday at about 5:30 or 6:00 P. M. Hill claimed he asked Anita about her swollen face but she told him it was none of his business. Thereafter he went home and watched television until 8:45 P. M. and then went over to his sister's house where he and his brother-in-law, Thomas Williams, had a few drinks and talked until 11:00 or 11:30 P. M. Hill then made several trips between his house and a bar until 2:00 A. M. when he and Hilda Patman watched the Late Late Show. Hill claimed he was surprised when the next morning,

Thelma Hankin called him and told him that Anita was dead. Thus, in this statement Hill denied even his presence in Anita's apartment the night of her death.

Hill testified that he was questioned thereafter three or four times a day until the following Tuesday when he gave a second statement which he described at trial as the truth. In this statement, Hill stated that he had been drinking with Hames that Saturday evening. Hames suggested they go over to Anita's. When they arrived they found Anita in bed with a man whom Hill "shook awake." The man, who was dressed in shorts and a T-shirt, tried to get up and run away. Hames said "let's get him," and began to chase the man out. Anita allegedly jumped up and came over to Hill and held onto his arms. Hill claimed he "threw Anita off" him and in the process hit her in the face with his left hand "I don't know where" and Anita fell to the floor. Hill then followed Hames out after the man and continued to chase him while Hames stopped at Anita's doorstep. When Hill returned, he found Anita in the bathroom appearing to be drunk. He helped her into bed, shut off the light and left.

The remainder of this statement reiterated in detail the facts of going back and forth to bars, going home at about 2:00 A. M. and watching television with his girl friend Hilda.

It is noteworthy that a reference to a chair beating is not contained in either statement.

On cross-examination, the State sought to impeach Hill by showing the conflict between his testimony and what was contained in each of the statements. Extended questioning in respect to what Hill stated in the statements resulted in the whole of them being placed on the record and before the jury. No objection was interposed by the defendant to this procedure. On the State's proffer, the written statements were admitted in evidence without objection.

We are satisfied that defendant himself opened this subject as a part of his trial strategy, desiring to make the jury aware of the fact that in neither statement is there a reference to a chair hitting. Thus to the point of whether or not

defendant struck the victim with a chair, these statements bolstered his defense and were beneficial to his cause. See *State v. Gallicchio*, 44 *N. J.* 540, 548–549 (1965). Moreover, the maneuver of the defendant forced the State to put the statements in evidence so that the jury would not think the State was hiding anything. When defendant brings this about there is no need to go into the question of voluntariness. We find no plain error.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.