705 A.2d 805

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JAMES EARL JONES, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 6, 1998—Decided February 11, 1998.

Before Judges DREIER, KEEFE and WECKER.

*Ivelisse Torres*, Public Defender of New Jersey, attorney for appellant (*William B. Smith*, Assistant Deputy Public Defender, of counsel and on the brief).

*James Earl Jones*, submitted a pro se brief.

The opinion of the court was delivered by

KEEFE, J.A.D.

In this death penalty case, the jury was unable to unanimously conclude beyond a reasonable doubt that defendant James Earl Jones purposely or knowingly caused the death of Hope Stauffer. The jury, however, found defendant guilty of the murder of Hope Stauffer, contrary to *N.J.S.A.* 2C:11–3a(1) (count one); felony murder, contrary to *N.J.S.A.* 2C:11–3a(3) (count three); first degree kidnapping of Hope Stauffer, contrary to *N.J.S.A.* 2C:13–1b(1)(2) (count four); second degree kidnapping of Hope Stauffer's son, M.S., contrary to *N.J.S.A.* 2C:13–1b(1)(2) (count five); conspiracy to commit robbery, contrary to *N.J.S.A.* 2C:5–2 (count six); first degree robbery, contrary to *N.J.S.A.* 2C:15–1 (count seven); possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4a (count eight); unlawful possession of a weapon, contrary to *N.J.S.A.* 2C:39–5b (count nine); and first degree aggravated sexual assault, contrary to *N.J.S.A.* 2C:14–2a(3) (count eleven). Count ten, charging defendant with third degree hindering apprehension or prosecution, contrary to *N.J.S.A.* 2C:29–3b(1), and count twelve, charging defendant with

fourth degree hindering apprehension, contrary to *N.J.S.A.* 2C:29–3b(4), were dismissed by the trial judge during trial.[1]

At sentencing, the trial judge merged the felony murder conviction into the murder conviction and the conspiracy and possession of a weapon for an unlawful purpose convictions into the robbery conviction. The judge then imposed the following consecutive terms of imprisonment: life with a 30 year parole disqualifier for murder (count one); 30 years with a 15 year parole disqualifier for first degree kidnapping (count four); 10 years with a five year parole disqualifier for second degree kidnapping (count five); and 20 years with a 10 year parole disqualifier for aggravated sexual assault (count eleven). As to the remaining counts for which defendant was found guilty, the judge imposed the following concurrent terms of imprisonment: 20 years with a 10 year parole disqualifier for first degree robbery (count seven) and 5 years with a 2-1/2 year parole disqualifier for unlawful possession of a weapon (count nine). Defendant, therefore, received an aggregate prison term totalling life plus 60 years, with a 60 year period of parole ineligibility. The appropriate V.C.C.B. penalties were also imposed.

On appeal, defendant raises the following issues through appellate counsel:

I.  THE JURY INSTRUCTION ON ACCOMPLICE LIABILITY WAS IN-
    CORRECT IN THAT IT POTENTIALLY CAUSED THE JURY TO
    BELIEVE THAT MERELY SILENTLY ASSENTING TO AND AP-

---

[1] Lawrence Bell was also indicted in the same indictment with defendant. He was charged separately with murder in count two of the indictment and was named along with defendant in counts three through eleven. Bell, who was 14 years old at the time of the incident, was tried as an adult. He was convicted of murder, felony murder, first degree kidnapping, second degree kidnapping, conspiracy to commit first degree robbery, first degree robbery, second degree possession of a weapon for an unlawful purpose, third degree unlawful possession of a handgun, and second degree sexual assault. His conviction and sentence were affirmed by this court in an unreported opinion on March 7, 1996. (*State v. Lawrence Bell*, A–1632–92T4). The Supreme Court denied certification. *See* 145 *N.J.* 371, 678 A.2d 712 (1996).

PROVING OF ANOTHER PERSON'S CRIMINAL BEHAVIOR MAKES ONE AN ACCOMPLICE TO THOSE CRIMES. *(Not Raised Below).*

II.  DEFENDANT'S CONVICTIONS OF PURPOSEFUL AND KNOWING MURDER AND FELONY MURDER MUST BE REVERSED SINCE THE TRIAL JUDGE ERRONEOUSLY PREVENTED DEFENSE COUNSEL FROM ARGUING THAT THE LACK OF FRACTURE TO THE VICTIM'S HYOID BONE AND LARYNX WAS EVIDENCE THAT DEFENDANT'S CONDUCT HAD BEEN RECKLESS, RATHER THAN PURPOSEFUL OR KNOWING.

III. DEFENDANT'S CONVICTION ON THE ELEVENTH COUNT OF THE INDICTMENT MUST BE REVERSED AND THE COUNT DISMISSED AS *N.J.S.A.* 2C:14–2a(3) UNCONSTITUTIONALLY SETS UP AN IRRE-BUTTABLE PRESUMPTION THAT AN ACT OF SEXUAL PEN-ETRATION OCCURRING DURING A MURDER IS UNCONSENTED TO; ALTERNATIVELY, THE COURT ERRED IN FAILING TO CHARGE THAT THE STATUTE CREATED A PERMISSIVE INFER-ENCE ONLY AND THAT THE STATE HAD TO PROVE LACK OF CONSENT BEYOND A REASONABLE DOUBT. *(Not Raised Below).*

IV.  DEFENDANT'S CONVICTION OF AGGRAVATED SEXUAL ASSAULT MUST BE REVERSED SINCE THE TRIAL JUDGE FAILED TO IN-STRUCT THE JURORS THAT THE STATE MUST PROVE BEYOND A REASONABLE DOUBT THAT THE VICTIM WAS ALIVE WHEN THE ACT OF SEXUAL PENETRATION OCCURRED. *(Not Raised Below).*

V.  BY AMENDING, OVER DEFENSE OBJECTION, THE FELONY MUR-DER COUNT TO INCLUDE PREDICATE FELONIES NOT INDICTED BY THE GRAND JURY AS PART OF THE FELONY MURDER COUNT, THE COURT VIOLATED DEFENDANT'S STATE CONSTITUTIONAL RIGHT TO TRIAL ONLY UPON INDICTMENT.

VI.  THE SENTENCE IMPOSED MUST BE VACATED AS JUDGE STEIN-BERG ERRONEOUSLY GAVE RETROACTIVE EFFECT TO THE 1993 AMENDMENT TO *N.J.S.A.* 2C:44–5A, IMPROPERLY USED THE AVENEL REPORT TO SUPPORT THE SENTENCE AND IMPOSED AN OTHERWISE EXCESSIVE SENTENCE.

In his *pro se* brief, defendant raises the following additional points:

I.  TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PURSUE THE DEFENSES OF INTOXICATION AND DIMINISHED CAPACITY.

II.  REVERSIBLE ERROR WAS COMMITTED BY THE TRIAL COURT IN FAILING TO PROPERLY INSTRUCT THE JURY ON THE DEFENSE OF INTOXICATION AND POSSIBLE LESSER INCLUDED OF-FENSES.

III. THE STATEMENT MADE BY THE DEFENDANT TO THE POLICE SHOULD HAVE BEEN EXCLUDED.

IV.  THE TRIAL JUDGE ERRED IN FAILING TO DEFINE CAUSATION
     TO THE JURY IN HIS CHARGE ON FELONY MURDER.  (Not Raised
     Below).

In the early hours of June 29, 1990, Hope Stauffer drove her two brothers, Robert and Timothy, and a friend, David Ray ("Ray"), to the Rosedale Tavern in Pennsauken to purchase wine coolers.  Hope's four-year-old son, M.S., was also in the car with them.  Hope and her son remained in the car which was parked in the Rosedale Tavern parking lot, while the Stauffer brothers and Ray went inside the tavern.  The three men were gone approximately five to fifteen minutes.  Before entering the tavern, Timothy Stauffer noticed three males sitting in the back of a black pick-up truck.

According to defendant's second taped statement that was played at trial, defendant and co-defendant Bell hitched a ride in a black pick-up truck to the Rosedale Tavern.  Defendant claimed that after spotting Hope in the parking lot, Bell ran over to her and put a "snub nose thirty-eight" gun to her head.  Bell demanded Hope to "move over Bitch" as he got into the driver's side of the car.  He then moved M.S. from the front seat to the back seat.  Defendant got into the passenger side of the car.  While Bell drove off from the parking lot, he threatened Hope that "he would shoot her if she [did] something stupid."  Hope was crying and begging the two defendants not to hurt her son.

After driving to a field, Bell forced Hope out of the car, grabbing her by the wrist while keeping the gun pointed towards her.  Defendant followed Bell and the victim into a wooded area.  Defendant forced Hope to the ground, on a tan cushion, by choking her.  While defendant continued to choke Hope, Bell "stood to the side with the pistol out" threatening, "Bitch, I'll shoot you act stupid, bitch, I'd shoot you, you act stupid."  As Hope struggled, she begged defendant to, "please get off me, please get off me."

Bell put the pistol in his pants and also began choking Hope again with more force.  Defendant continued holding Hope by the

neck while Bell pulled her clothes off. Defendant claimed that Bell persisted choking Hope while he had sex with her. After about five minutes, defendant ejaculated and "just left, cause I knew she was dead then." Defendant stated that in his mind, as he "was getting ready . . . [to] stick [his] penis in her, she was not alive at all." Defendant later stated that when he had "gotten on top of [Hope]" her body was shaking and it did not stop shaking until Bell "put his hands around her neck for a short period of time." Once defendant finished the sexual assault, he noticed that the victim was "out of it"; he checked for a pulse but did not feel one. When asked again whether the victim was dead while he had intercourse with her, defendant responded:

> There was no doubt at all, once I had finish coming to the end of having intercourse with her, that she was dead.

As defendant fled, he noticed Bell pull his pants down and proceed to have sex with Hope. Defendant ran to the car where Hope's son had remained and Bell followed, saying, "[T]he bitch is dead, the bitch is dead." Bell drove the car from the woods and dropped defendant and M.S. off on the corner of 29th Street. Bell abandoned the car on Cramer Street and fled.

Defendant asked M.S., who was crying, where he lived. The child responded, "Uncle Joey, 28th Street, Uncle Joey, 28th Street." Defendant admitted that he thought if he brought the child back home he would be less likely to be deemed a suspect.

In the interim, Hope's family realized she and M.S. were missing and began looking for her. They later received word that M.S. was at Joseph Stauffer's house. The Stauffer family went to Joseph's house where defendant told them that he found the child wandering the streets near a church. Defendant led the family to the area where he claimed to have discovered the child and also searched near the church and railroad tracks for the victim. While searching the area near the railroad, Robert Stauffer found the victim's car in a grass parking lot. The tires of the car were covered with mud and the steering wheel cover was "all ripped up." Robert summoned the police.

Officer Robert Morley of the Pennsauken Township Police Department was among those who arrived to investigate the call. Defendant identified himself to Officer Morley as "Clarence Owalsn." Defendant told Officer Morley that he found M.S. while walking through a wooded area behind the Stockton Station Apartments.

Defendant accompanied the Stauffer family and some friends as they searched for the victim. At one point, the searchers were close to the site where the victim's body was located but defendant diverted them from the area saying, "[N]ever mind, don't worry about it, she's not back there." Defendant explained that he did not want to lead them to the site for fear "they would have felt as though it was obvious that [he] had something to do with it by [him] bringing the baby home and saying to go down that road." Officer Ted Nickles of the Pennsauken Police K–9 Unit joined the search and ultimately found Hope's naked, lifeless body.

Officer Morley subsequently identified defendant as James Earl Jones and learned that there was an outstanding warrant for defendant in Camden. Defendant was then placed under arrest and taken into custody.

The autopsy established that Hope died from strangulation. She suffered hemorrhaging and muscle bruising in the neck, including the thyroid gland and larynx. The hemorrhaging and bruising ranged from one-half to one inch deep from the skin. The autopsy also revealed a one-inch laceration of the tissue between her vagina and rectum, indicative of sexual assault. In addition, she suffered a series of injuries including significant purple discoloration of the neck, chest and face; scrapes on the right shoulder, left forearm, left thigh, nose and chin; and bruising to the left shoulder.

According to Dr. Segal, the county medical examiner,

the strangulation occurred when she was alive, the laceration of the perineum when she was alive, and the majority of the scrape marks and bruises when she was alive.... The clearly postmortem injuries were the scratch marks on the lower legs, both sides ... [and the] insect bites.

With regard to the sexual assault, although nonmotile sperm were detected through microscopic examinations of the vaginal material, Dr. Segal stated that "there's no way to say whether the sperm got there when the person was alive or dead."

Extensive forensic testing showed consistencies between hair found on defendant's clothes and Hope's pubic hair. Also, brown hairs found on defendant's sock and shirt matched Bell's hair. The soil lifted from Hope's car was consistent with the soil taken from the crime scene. Defendant's palm prints were found on the passenger side of the car trunk, the trunk itself, and the rear driver's side window of Hope's car. Cotton fibers of Hope's red shirt were found on Bell's clothing; likewise, black cotton fiber from Bell's black shorts was found on Hope's red shirt.[2]

**[At the request of the court, only points II, III, IV and V merit publication, and, therefore, the remaining issues are omitted].**

## II.

Defendant contends that the trial judge erred by precluding defense counsel from referring to the victim's unfractured hyoid bone during closing arguments. This issue was argued by the parties prior to closing arguments:

> [Prosecutor]: [Defense counsel] indicated he was going to argue certain things that the jury can find because of the lack of a fracture of the hyoid bone ... the bone down here in the neck near the larynx area.

> My understanding is he was going to ask the jury to infer because of that bone not being fractured then less force was applied, so that he could argue that would be reckless conduct as opposed to purposeful conduct.

---

[2] Bell's rendition of the events, detailed in an unpublished opinion by this court, are inconsistent with defendant's version. While the events leading up to and including the victim's death are almost identical, Bell implicates defendant as the one who approached the victim, held the gun to her head, threatened to shoot her, decided to rape her, and choked her to death. Bell testified on his own behalf at trial and denied any involvement in the sexual assault or murder.

Quite frankly, there is no mention [in] the testimony about the hyoid bone, what it would take to fracture it, whether or not it's likely to be fractured in this type of patient or person.

My understanding of reading the literature is that it's not uncommon to have an unfractured hyoid bone. Especially, in a person this age.

Apparently, the hyoid bone—comes up like a T and separates at the top and . . . that area of the bone gets brittle like most bones with age and a person younger is less likely to fracture than a person older.

There is absolutely no testimony concerning the bone and whether it fractured and could be fractured or why it's not fractured to allow comment on it.

THE COURT: Okay.

[DEFENSE COUNSEL]: Judge, Dr. Segal under both Direct and Cross testified that the hyoid bone was not broken; the hyoid bone and larynx were intact.

I think it's perfectly permissible to argue to the jury that broken bones indicate intent. There's been no medical expert testimony nor does there need to be. I'm free to argue to this jury and it was calculated on my part.

I purposely didn't ask the doctor about the broken hyoid bone or lack thereof and . . . I have no burden, I'm the defense. The State had a burden to put that in the portion of the case. . . .

I'm not testifying as a doctor. I don't pretend to be one. Simply, arguing to the jury: "You have testimony before you that the hyoid bone and larynx are intact; you can infer from that that the force necessary to break it was not present."

That's a logical inference I think I should be permitted to argue.

## Judge Steinberg made the following ruling:

You are asking them to infer from that, therefore, great pressure was not exerted. I happen to agree with the prosecutor, that is anatomy and that's something that ordinarily calls for expert testimony.

I'm certainly not about to take judicial notice of the fact that [because] the . . . bone . . . was not fracture[d][it] means that there was a less degree of force applied than that which is purposeful or knowing. That is a matter that I think requires expert testimony to assist the jury and in the absence of any expert testimony with respect to that, the objection is sustained.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

It certainly has the capacity to mislead. I don't know and you don't know the fact and more importantly the jury doesn't know. The doctor was on the stand and it was not asked.

The jury is going to be given a piece of argument that may or may not be scientifically correct. I'm going to sustain the objection.

Defense counsel is entitled to wide latitude in making his or her summation. *See State v. Reynolds,* 41 *N.J.* 163, 176, 195 *A.*2d 449 (1963), *cert. denied,* 377 *U.S.* 1000, 84 *S.Ct.* 1930, 12

*L.Ed.*2d 1050, *reh'g denied,* 379 *U.S.* 873, 85 *S.Ct.* 22, 13 *L.Ed.*2d 80 (1964). Nevertheless, "[t]he scope of defendant's summation argument must not exceed the 'four corners of the evidence.'" *State v. Loftin,* 146 *N.J.* 295, 347, 680 *A.*2d 677 (1996) (quoting *Reynolds, supra,* 41 *N.J.* at 176, 195 *A.*2d 449). "The 'four corners' include the evidence and all reasonable inferences drawn therefrom." *Ibid.* (citing *State v. Hill,* 47 *N.J.* 490, 499, 221 *A.*2d 725 (1966)). Thus, it is proper for a trial court to preclude references in closing arguments to matters that have no basis in the evidence. *Ibid.*

■ In this case, there was no evidence submitted at trial concerning the hyoid bone. Indeed, on appeal, defendant concedes that the medical examiner never expressly referred to the hyoid bone during his testimony. Clearly then any such reference by defense counsel would have exceeded the "four corners" of the evidence. The trial judge did not err in his ruling on this point.

■ We are also satisfied that the defendant's argument required expert testimony to support it. The trial judge may require expert testimony when the matter to be dealt with is "so esoteric that jurors of common judgment and experience cannot" otherwise form a valid judgment as to the fact in issue without expert testimony. *Butler v. Acme Markets, Inc.,* 89 *N.J.* 270, 283, 445 *A.*2d 1141 (1982) (citation omitted); *see also* Biunno, *Current N.J. Rules of Evidence,* comment 1 on *N.J.R.E.* 702.

Defense counsel wanted to argue to the jury during his closing statement that:

"You have testimony before you that the hyoid bone and larynx are intact; you can infer from that that the force necessary to break it was not present."

The importance or non-importance of an intact hyoid bone, and how that reflects upon the pressure used to strangle someone and correspondingly upon the aggressor's state of mind, is a matter that is "esoteric" and is an issue upon which jurors of common judgment and experience could not form a valid judgment without expert testimony. *See Butler, supra,* 89 *N.J.* at 283, 445 *A.*2d 1141.

## III.

Defendant was convicted of first degree aggravated sexual assault in violation of *N.J.S.A.* 2C:14–2a(3). That statute provides that a defendant will be guilty if the act of sexual penetration "is committed during the commission, or attempted commission, whether alone or with one or more other persons, of robbery, kidnapping, homicide, aggravated assault on another, burglary, arson or criminal escape." In the context of this case, defendant concedes that a knowing sexual penetration of another in the course of a homicide suffices to establish the offense.

For the first time on appeal, however, defendant contends that the statute is unconstitutional if it is interpreted to permit his conviction without requiring the jury to be instructed that proof of the predicate underlying offense of homicide creates only an inference that the sexual act was "unconsented to." In the absence of such an instruction, defendant contends that the "statute operates to create a hidden, conclusive presumption" that a "sex act occurring during a homicide occurs against the victim's will" and, thus, violates his federal and state constitutional rights. No such instruction was requested at trial, but the absence of such a request is not determinative of our resolution of this issue.

The history of the adoption of our current law concerning sexual offenses has been thoroughly explored by the Supreme Court in *In re M.T.S.*, 129 *N.J.* 422, 609 *A.*2d 1266 (1992) and need not be repeated here. Suffice it to say that "in reforming the rape laws, the Legislature placed primary emphasis on the assaultive nature of the crime, altering its constituent elements so that they focus exclusively on the forceful or assaultive conduct of the defendant." *Id.* at 442, 609 *A.*2d 1266. Thus, in redefining "rape consistent with the law of assault and battery," the Legislature decided "to eliminate non-consent and resistance from the substantive definition of the offense." *Id.* at 443, 609 *A.*2d 1266.

In general, sexual assault is proven when the State offers evidence of sexual penetration in circumstances where a reason-

able person would not believe that the victim had given "affirmative and freely-given permission ... to the specific act of sexual penetration." *Id.* at 444, 609 *A.*2d 1266. Evidence of force against the victim "in excess of that inherent in the act of penetration" is sufficient proof of the latter element of the offense. *Ibid.*

We construe *N.J.S.A.* 2C:14–2a(3) to be a legislative determination that proof of one or more of the predicate crimes identified therein is all that is necessary to establish the absence of "affirmative and freely-given permission." Although it is difficult to imagine circumstances, such as here, where the victim of a kidnapping, robbery and homicide would, nonetheless, affirmatively and freely give permission to the act of sexual penetration, such a reading of the statute leaves open the possibility that such could be the case. And in that rare case, the evidence pertaining to consent would be relevant on the issue of the force used to commit the act of penetration. *See State v. Cuni,* 303 *N.J.Super.* 584, 697 *A.*2d 550 (App.Div.) (holding that evidence of consent is relevant where the first degree aggravated assault was predicated on the commission of a burglary with intent to commit second degree sexual assault), *certif. denied,* 152 *N.J.* 12, 702 *A.*2d 351 (1997); Cannel, *N.J. Criminal Code Annotated,* comment on *N.J.S.A.* 2C:14–5 (1997–98). Although we are cognizant of the argument that the statute can be interpreted to eliminate consent as a relevant factor where the circumstances are as identified in *N.J.S.A.* 2C:14–2a(3), that intent is not manifestly clear from the words of the statute or the relevant statutory history. Cannel, *Criminal Code Annotated, supra.* Allowing the introduction of such evidence in the rare case, however, gives a defendant all the process that is due to an accused under such circumstances.

In this case, there were simply no facts upon which the issue of consent could rationally be considered by the trier of fact. Accordingly, the trial judge did not err in his instructions to the jury.

## IV.

It is defendant's position that the crime of sexual assault requires a living person, that the State was required to prove beyond a reasonable doubt that the victim was alive at the time of penetration, and that the absence of a jury charge to that effect constitutes reversible error. Defendant relies upon: (1) his second statement to the police, wherein he stated that the victim was dead when he penetrated her; and (2) the medical examiner's testimony that there is "no way to say whether the sperm got there when the person was alive or dead."

Although defendant did not ask the court to charge the jury that the victim had to be alive at the time of penetration, there is some suggestion in the record that the issue was broached by trial counsel. During oral argument on defendant's motion to dismiss, defense counsel stated, *with reference to the felony murder count:*

> My argument would have been for the purposes of making that Appellate record, Jones' statement indicates obliquely at three points she was dead at the act of sexual penetration. There is some issue there whether you can rape a dead person, whether that can support a felony murder conviction.

> \*     \*     \*     \*     \*     \*     \*     \*

> THE COURT: The argument is you can't have force against a dead person. . . .

> [PROSECUTOR]: Having said that, I think what makes the most sense is for me to skip ahead to the next count. . . .

Nevertheless, defendant's appellate brief designates this point as one not raised below. We will address the issue as if it had been properly presented.

The language of the criminal code does not expressly indicate whether a rape victim must be a living person. As noted above, *N.J.S.A.* 2C:14–2a provides, in pertinent part, that

> An actor is guilty of aggravated sexual assault if he commits an act of sexual penetration *with another person* under any one of the following circumstances. . . .

As a general matter under the criminal code, "person" is defined as "any natural person." *N.J.S.A.* 2C:1–14g. There is no New Jersey authority that addresses the specific issue.

Various other states, however, have addressed this issue and have reached conflicting results. *See* John E. Theuman, *Fact that Murder–Rape Victim was Dead at Time of Penetration as Affecting Conviction for Rape*, 76 *A.L.R.*4th 1147 (1990). Courts in Georgia, Kentucky, Massachusetts, Ohio, and Tennessee have concluded that the death of a rape-murder victim prior to penetration did not necessarily preclude a rape conviction.[3] To the contrary, courts in California, Kansas, Maryland, Michigan, Nevada, Oklahoma, and Pennsylvania have concluded that a rape conviction requires that the rape-murder victim be alive at the time of penetration.[4]

We believe the states that require proof that a rape-murder victim be alive at the time the assaultive behavior begins but not at the time of penetration best represent the principles that undergird our sex offense law. That is so because our criminal code focuses more on the assaultive behavior than the sexual act. *M.T.S., supra*, 129 *N.J.* at 442–443, 609 *A.*2d 1266. In that context, when a sexual assault is committed as part of one "continuous transaction," the status of the victim at the time of

---

[3] For Georgia, *see Lipham v. State*, 257 *Ga.* 808, 364 *S.E.*2d 840(Ga.), *cert. denied*, 488 *U.S.* 873, 109 *S.Ct.* 191, 102 *L.Ed.*2d 160 (1988); for Kentucky, *see Smith v. Commonwealth*, 722 *S.W.*2d 892 (Ky.1987); for Massachusetts, *see Commonwealth v. Waters*, 420 *Mass.* 276, 649 *N.E.*2d 724 (1995); for Ohio, *see State v. Whitsell*, 69 *Ohio App.*3d 512, 591 *N.E.*2d 265 (1990); for Tennessee, *see State v. Irick*, 762 *S.W.*2d 121 (Tenn.1988), *cert. denied*, 489 *U.S.* 1072, 109 *S.Ct.* 1357, 103 *L.Ed.*2d 825 (1989), and *State v. Brobeck*, 751 *S.W.*2d 828 (Tenn.1988).

[4] For California, *see People v. Davis*, 10 *Cal.*4th 463, 41 *Cal.Rptr.*2d 826, 896 *P.*2d 119 (1995), *cert. denied*, 516 *U.S.* 1121, 116 *S.Ct.* 932, 133 *L.Ed.*2d 859 (1996); *People v. Rowland*, 4 *Cal.*4th 238, 14 *Cal.Rptr.*2d 377, 841 *P.*2d 897 (1992), *cert. denied*, 510 *U.S.* 846, 114 *S.Ct.* 138, 126 *L.Ed.*2d 101 (1993); *People v. Stanworth*, 11 *Cal.*3d 588, 114 *Cal.Rptr.* 250, 522 *P.*2d 1058 (.1974); for Kansas, *see State v. Perkins*, 248 *Kan.* 760, 811 *P.*2d 1142 (1991); for Maryland, *see Hines v. State*, 58 *Md.App.* 637, 473 *A.*2d 1335 (1984); for Michigan, *see People v. Hutner*, 209 *Mich.App.* 280, 530 *N.W.*2d 174 (1995); for Nevada, *see Doyle v. State*, 112 *Nev.* 879, 921 *P.*2d 901 (1996); for Oklahoma, *see Rogers v. State*, 890 *P.*2d 959 (Okla.Crim.App.), *cert. denied*, 516 *U.S.* 919, 116 *S.Ct.* 312, 133 *L.Ed.*2d 215 (1995); for Pennsylvania, *see Commonwealth v. Sudler*, 496 *Pa.* 295, 436 *A.*2d 1376 (1981).

penetration is deemed irrelevant. *See, e.g., Commonwealth v. Waters,* 420 *Mass.* 276, 649 *N.E.*2d 724, 726 (1995); *Commonwealth v. Tarver,* 369 *Mass.* 302, 345 *N.E.*2d 671, 679 (1975). As stated in *Waters,*

> In the circumstances of one continuous event, it does not matter whether the victim's death preceded or followed the sexual attack.
>
> [*Waters, supra,* 649 *N.E.*2d at 726.]

In these cases, the prosecution must "show that the victim was alive when the series of assaults began which ultimately resulted in the act of sexual penetration charged," but need not show that the victim "was still alive at the completion of the sequence of events." *State v. Whitsell,* 69 *Ohio App.*3d 512, 591 *N.E.*2d 265, 278 (1990). "[T]he mere fact that the victim might have been dead by the time the penetration occurred does not detract from appellant's culpability." *Ibid.*

This result is also implicitly supported by one pre-code New Jersey decision, *State v. Knight,* 96 *N.J.L.* 461, 115 *A.* 569 (E. & A.1921), which stated:

> The suggestion that, when the victim dies from shock directly resulting from the attack upon her, and the death precedes attempted penetration, the party committing the assault does not come within the condemnation of the statute, is entirely too unsubstantial to justify extended discussion.
>
> [*Id.* at 470, 115 *A.* 569.]

In sum, by defendant's own admission, Hope Stauffer was alive when he was laying on top of her on the ground choking her and when Lawrence Bell began removing her clothing. That is all the law requires.

## V.

Defendant argues that Judge Steinberg erred by charging the jury that the predicate felonies underlying the felony murder charge could include aggravated sexual assault, kidnapping, and robbery, in spite of the fact that the indictment includes reference only to aggravated sexual assault. After extensive argument by counsel, and defendant's statement on-the-record in support of his attorney's position, Judge Steinberg reasoned and held as follows:

To be honest with you, what really concerns me is the language in *Purnell*....
In that case the problem was that [there] were predicate felonies alleged in the indictment, but no count for felony murder and the Supreme Court held ... that the failure to submit to the jury felony murder ... as an alternate to a death eligible case when there is a rational basis for a jury verdict of felony murder is not constitutionally permissible.

I recognize the fact that in this case we have a felony murder count, but my overriding concern is the fact that that felony murder count is limited to one predicate felony and that is aggravated sexual assault.

In *State v. Purnell*, 126 *N.J.* 518, 601 *A.*2d 175 (1992), the defendant was indicted for murder, hindering apprehension, possession of a weapon for an unlawful purpose, and perjury. *Id.* at 529, 601 *A.*2d 175. During the guilt phase of the trial, the State submitted evidence that the murder occurred during the commission of a robbery. *Id.* at 524, 601 *A.*2d 175. Defendant had not been indicted for robbery, *id.* at 529, 601 *A.*2d 175, and the jury was not given the option of convicting defendant for felony murder based upon the predicate crime of robbery. *Id.* at 523, 601 *A.*2d 175.

At the sentencing phase, the State asserted as an aggravating factor the fact that the murder occurred during the commission of a robbery. *Ibid.* The jury unanimously found that this aggravating factor existed, and the defendant was subsequently sentenced to death. *Id.* at 529–30, 601 *A.*2d 175.

On appeal, the Supreme Court reversed the sentence of death based upon the trial court's failure to charge felony murder. *Id.* at 523, 530–34, 601 *A.*2d 175. The Court stated:

New Jersey defendants cannot be subjected to the death penalty for murder if their intent is found to be anything less than knowingly or purposefully to cause death. If, within the body of evidence presented at trial, proofs exist that provide a rational basis for a jury verdict of a lesser-included offense, a defendant is constitutionally entitled to have that alternative offered for jury deliberation.... To deprive a capital defendant of a lesser-included alternative murder charge, which arguably would have affected the deliberation of a death sentence, is not constitutionally permissible.

[*Id.* at 532, 601 *A.*2d 175 (citations omitted).]

The facts of *Purnell* are somewhat different than the facts of this case. In *Purnell* the issue of a felony murder charge was not

raised; the charge was neither requested nor challenged by the defendant. *Id.* at 524, 601 A.2d 175. Nevertheless, the Court touched upon the issue raised by a defendant's specific request that a lesser-included or "alternative" offense not be charged in a capital case:

> Obviously, there may be circumstances in which a defendant will specifically request that a jury not be charged on a lesser-included offense as a matter of trial strategy. Whether such a request can or should. be acceded to especially in a capital case, raises concerns regarding the interests of the public (represented by the jury) in being presented with "all of the facts and all of the possible offenses that may reasonably be found from such facts." We need not debate that issue in this case, for there is nothing in the record to indicate that a specific request not to charge felony-murder was made here.
>
> [*Id.* at 532, 601 A.2d 175 (citations omitted).]

Judge Steinberg, relying on *Purnell,* concluded that a charge of felony murder based upon all the predicate felonies presented was required. His reasoning is best described in his own words:

> It's not a question of notice. The defendant is on notice he's also charged with robbery and/or aggravated sexual assault and that under the statute those are predicate felonies which would support a charge and conviction for felony murder. So, he's specifically indicted for the predicate felonies. They are in the case, they were tried and ... will be argued and therefore I'm not so sure that the distinction between *Purnell* and *Jones* is anything more than a distinction without a difference.
>
> Because, we have the same result. We have a jury being deprived and defendant being deprived of other predicate felonies which could lead the jury towards a felony murder conviction and away from a purposeful or knowing conviction and could therefore lead the jury towards a non-death eligible verdict.
>
> And more importantly, the concern really is by limiting the consideration to one predicate felony, it steers the jury towards the potential of purposeful or knowing conviction if they are satisfied beyond a reasonable doubt that the killing took place, but for one reason or another they have a reasonable doubt as to whether it took place during the course of an aggravated sexual assault.
>
> So, that what we are doing is we are increasing the potential for a death sentence and the downside of it is that, yes, there is another two ways where the jury could find him guilty of a felony murder.

The *Purnell* Court emphasized the constitutional importance of providing a jury with every "death ineligible" alternative when the record contains a "rational basis" for such alternatives. There can be no doubt that the record in this case provides a rational basis for felony murder based upon the predicate crimes of kidnapping

and robbery, for which defendant was separately indicted and convicted.

■ When a separate offense is "a basis for an alternative form of murder that is non-capital, a defendant is constitutionally entitled to have that alternative offered for jury deliberation." *Id.* at 534, 601 *A.*2d 175. Although *Purnell* does not address whether such alternatives must be offered over a defendant's objections, we believe the reasoning and logic of the decision apply to this situation, and that it was entirely proper for Judge Steinberg to give the jury every possible death-ineligible alternative supported by the record.

The holding in *Purnell* was recently fortified by the Court in *State v. Cooper,* 151 *N.J.* 326, 361, 700 *A.*2d 306 (1997).

> *Purnell, supra,* requires that in a capital murder case, "all forms of homicide rationally supported by the evidence ... should be placed before the jury." *Purnell* ... requires that felony murder be submitted to the jury in capital cases if rationally supported by the evidence.... In *Purnell,* the rational basis was the State's reliance on death occurring in the course of a felony as an aggravating factor *even though felony murder was not charged in the indictment.*
>
> [*Ibid.* (citations omitted) (emphasis added).]

In conclusion, we find no error in Judge Steinberg's decision to charge the jury on each of the predicate crimes for felony murder which were supported by the record.

Affirmed.