725 A.2d 106 (1999)
319 N.J. Super. 284
STATE of New Jersey, Plaintiff-Respondent,
v.
Tracy SPENCER, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 9, 1999.
Decided March 12, 1999.
*109 James K. Smith, Jr., Assistant Deputy Public Defender, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Smith, of counsel and on the brief).
Jordana Jakubovic, Deputy Attorney General, for plaintiff-respondent (Peter Verniero, Attorney General, attorney; Ms. Jakubovic, of counsel and on the brief).
Before Judges PRESSLER, KLEINER and STEINBERG. *107
*108 The opinion of the court was delivered by STEINBERG, J.A.D.
Following a trial by jury, defendant Tracy Spencer was found guilty of first-degree aggravated manslaughter, (N.J.S.A. 2C:11-4(a)) as a lesser-included offense of first-degree murder, (N.J.S.A. 2C:11-3(a)(1) and (2)) (count one); felony murder, (N.J.S.A. 2C:11-3(a)(3)) (count two); first-degree aggravated sexual assault, (N.J.S.A. 2C:14-2(a)(1)) (count three); and first-degree aggravated sexual assault, (N.J.S.A. 2C:14-2(a)(6)) (count four). The trial judge merged counts one, three, and four into count two and sentenced defendant to life in prison, with a thirty-year period of parole ineligibility. In addition, the judge imposed a Violent Crimes Compensation Board Penalty of $100. Defendant appeals. We reverse.
After defendant's release from prison in October 1988, he resumed his relationship with D.C., the mother of his daughter, Y.C., born March 17, 1988. Although D.C. had primary custody of Y.C. she permitted defendant to take the baby home to his mother's house one night every other weekend. On Friday, March 10, 1989, D.C. spent most of the day driving around with defendant. They returned to D.C.'s house at approximately 10:00 p.m. Before D.C. exited the car, defendant asked if Y.C. could spend the night with him, promising to take the baby straight home to his mother's house. D.C. agreed and went inside to retrieve Y.C.
When D.C. went inside the home to retrieve Y.C., her brother, L.C. told her not to give Y.C. to defendant. When D.C. refused to listen to him, L.C. went out and spoke directly to defendant. L.C. informed defendant that he had learned from defendant's sister what he was doing to the baby and cautioned defendant to take better care of Y.C.
The following evening, March 11, 1989, defendant appeared at D.C.'s house at approximately 7:30 p.m. He told her that his mother had taken Y.C. to church and asked if she wanted to go out. After D.C. agreed, *110 defendant informed her that he would be back to pick her up at 9:30 p.m. However, he never returned. She was able to locate defendant at his cousin's apartment and thereafter defendant and D.C. went out together. Defendant advised her that he planned on returning Y.C. the following afternoon.
The next day, Sunday, March 12, 1989, D.C. called defendant's house at noontime and asked defendant's half-brother Pete if he had seen Y.C. When Pete replied that he had not, and that defendant was asleep, she insisted that he wake defendant. Defendant came to the phone and informed D.C. that Y.C. was in his room asleep and that he would return her to D.C. at 3:00 p.m. However, at 3:30 p.m. defendant called and said that he was helping his cousin move furniture and that he would bring Y.C. home as soon as he was through. When she did not hear from defendant by 7:00 p.m., D.C. went to defendant's cousin's apartment and was told that defendant had gone to New York. D.C. then called defendant's house in an effort to get more information but was unable to learn anything further about his whereabouts.
The next day, Monday, March 13, 1989, D.C. again called defendant's house. His family said they had not seen him and D.C. decided to go out looking for him. She was unsuccessful and went to the local police station at approximately 7:30 p.m. to report Y.C. missing. However, the police advised her that they would not fill out a missing persons report since defendant was the father. She was further advised that defendant's mother would have to come in and fill out a missing persons report on him, and then she could fill out a missing persons report for Y.C.
The next day, Tuesday, March 14, 1989, D.C. and defendant's mother went to the police station and met with Sergeant Joseph Tamburelli. According to Tamburelli, defendant's mother gave him permission to search the back yard and basement of her home. Accordingly, he obtained a picture of defendant and went to the home with Sergeant Donald Guth. Finding that the door to the house was unlocked, Tamburelli and Guth entered and went to the basement which was unfinished and contained old furniture and debris. Using a flashlight, Tamburelli approached a tall wooden chest and opened two mirrored doors, revealing a pile of clothes. He pulled two or three items off of the pile and discovered the body of Y.C. lying face-down. He rolled the baby over on her side and determined she was dead.
Shortly thereafter, the officers were joined in the basement by Investigator Charles Russo of the Essex County Prosecutor's Office. Russo noticed a flat piece of metal lying on the floor approximately three feet away from the baby. He determined that this piece of metal was a furnace cover on which there were legible fingerprints and what looked like recent footprints.
Russo obtained consent from defendant's mother to search the remainder of the house. While searching defendant's bedroom, Russo found a small glass vial containing a white powdery residue which proved to be .01 grams of cocaine. He also retrieved a bed sheet and mattress cover from defendant's bed. Later testing revealed that there were five semen stains on the sheet, but no blood.
Meanwhile, Tamburelli and Detective William Moffitt continued to search unsuccessfully for defendant. Ultimately, on Friday, March 17, 1989, Moffitt was advised that defendant had turned himself in to the police station. Defendant was advised of his Miranda rights[1], both orally and in writing, and he agreed to give a statement. In that statement defendant admitted using drugs for several hours on two days with Y.C. in his custody. He said that on the second day he was driving Y.C. home to D.C. when he decided to stop in order to buy some cigarettes. He said he got out of the car holding Y.C. and accidentally closed the door on his hand causing him to drop her. She hit the ground head-first and started to cry and then went into convulsions and began foaming at the mouth. According to defendant, he believed Y.C. was having seizures and immediately looked for something to stick in her mouth. He pulled the car key from the ignition and used it to press down on the *111 sides of Y.C.'s mouth. He stated that Y.C. continued to cry but stopped foaming at the mouth. However, eventually Y.C. shook and then was still. Defendant began to "suck" on Y.C.'s cheeks, hoping that this would make her cry as usual, but she did not respond. According to defendant, this "sucking" caused Y.C. to suffer facial bruises.
Defendant also said that once he realized that Y.C. was not breathing, he began breathing into her mouth and pushing on her chest. He heard air come back out through her mouth and thought that she was alive. He brought her home, cleaned her off, but noticed she was not moving, and decided to hide her in the basement. In the basement, he changed her diaper and noticed that it contained a mixture of blood and diarrhea. He said he was not sure if she was dead or alive and became frightened and decided to smoke some crack.
Defendant was arrested and spent the weekend of March 18-19, 1989, in the Hudson County Jail. On the morning of Monday, March 20, Moffitt obtained an order allowing him to take hair, blood, and saliva samples from defendant. Moffitt and another detective went to the holding cell at the Central Judicial Processing (CJP) Court[2] where defendant was waiting to appear before a judge and took him to the hospital where the samples were taken. On the way to the hospital defendant remarked that people were saying that the baby died of injuries, "where in fact it had died from suffocation". As they returned to the parking ramp for CJP defendant told the detectives he wanted to return to the Homicide Office to "straighten out this whole matter". Defendant then gave a second taped statement. In that statement defendant said that he dropped the baby on the first night when he was out "getting high". He stated that after being dropped she started crying "and I was hittin' on her and she kept crying and wouldn't shut up". He explained that he hit Y.C. in the face with his open hand and eventually she stopped crying and did not respond at any point thereafter. When he took her home and "was laying in bed with her" he saw that "she wouldn't move or anything" and was "either dead or unconscious". He then took her "downstairs in the basement to hide her from everybody" because he was frightened. He admitted that the baby was "[s]odomized, in her rectum, by my finger and that is it. All of it and I'm finished". He denied any other act of sexual penetration with Y.C. He said he was not sure if she was dead or alive when the act of penetration occurred adding "she was in a coma".
No semen was found in any of Y.C.'s body cavities or on any of her clothing. However, blood was found on the inside of her hat and in three separate locations on her diaper. One of the footwear impressions found on the furnace cover was found to be consistent with the tread on defendant's left sneaker.
In this appeal defendant raises the following issues:
POINT I THE DEFENDANT'S RIGHTS TO CONFRONT THE WITNESSES AGAINST HIM AND TO A FAIR TRIAL WERE VIOLATED WHEN THE TRIAL COURT ALLOWED THE PROSECUTOR TO INTRODUCE STATEMENTS OF PERSONS WHO DID NOT TESTIFY AS SUBSTANTIVE EVIDENCE OF GUILT UNDER N.J.R.E. 705.
A. The Prosecutor Was Allowed, Over Objection, To Use A Report Written By Dr. DiMaio, Who Did Not Testify, As Substantive Evidence Of The Cause Of The Injuries To The Victim.
B. The Prosecutor Was Allowed To Ask Dr. Teich About Unsubstantiated Allegations That Defendant Had Had Sex With A Jail Guard While Incarcerated.
C. Legal Argument.
POINT II THE TRIAL COURT ERRED IN ALLOWING LEROY CODY TO TESTIFY ABOUT HEARSAY ALLEGATIONS THAT DEFENDANT HAD BEEN MISTREATING HIS CHILD, AND THEN IN REFUSING *112 TO ALLOW DEFENSE COUNSEL TO CROSS-EXAMINE MR. CODY ABOUT HIS ALLEGED ATTEMPT TO HAVE DEFENDANT KILLED.
POINT III THE TRIAL COURT'S INSTRUCTIONS ON FELONY MURDER AND AGGRAVATED SEXUAL ASSAULT WERE ERRONEOUS INSOFAR AS THEY (1) FAILED TO MAKE CLEAR THAT DEFENDANT COULD NOT SEXUALLY ASSAULT A DEAD BODY UNLESS THE KILLING AND THE SEXUAL ASSAULT WERE PART OF A CONTINUOUS TRANSACTION; AND (2) INCORRECTLY TOLD THE JURY THAT THEY COULD CONVICT DEFENDANT OF FELONY MURDER IF HE HAD KILLED THE VICTIM DURING THE COURSE OF THE SEXUAL ASSAULT OR ITS "CONCEALMENT EFFORTS," WHILE FAILING TO STATE THAT "IMMEDIATE FLIGHT" ENDS WHEN THE DEFENDANT REACHES A PLACE OF TEMPORARY SAFETY. (Not Raised Below).
A. Introduction.
B. Sexual Penetration Of A Dead Body.
C. Killings Done During The "Concealment" Of The Felony.
We agree with defendant that the trial judge committed reversible error when he allowed the prosecutor to question defendant's expert pathologist about the report of a forensic pathologist who had been retained by the defense but who was not called to testify at trial. We conclude that that error requires a reversal of defendant's convictions.
The trial involved the classic confrontation between two expert forensic pathologists. The State relied upon Dr. Geetha Natarajan who was the Acting State Medical Examiner. She performed an autopsy on Y.C.'s body on the day it was discovered and concluded that the baby had been dead for quite some time. She observed that the top of Y.C.'s head, along with her forehead, right lower eyelid, right jaw bone, entire left cheek area, lips, as well as the area between her shoulder blades, were bruised. She also noted that Y.C.'s brain was swollen with attendant hemorrhage. Due to the absence of abrasion and the presence of a circular pattern consistent with a knuckle imprint within the left cheek bruising, she opined that Y.C. had been struck by a hand or fist as opposed to being dropped. She also concluded that Y.C. had been alive at the time all of her injuries were inflicted and that she had died from the effects of this blunt force trauma.
Dr. Natarajan also noticed that Y.C.'s jaw bone had been fractured on both sides and that there was moderate to severe swelling and reddening in her anus, which was dilated, together with related hemorrhage in certain portions of her rectum. Based upon the location of the jaw bone fractures and the fact that they were vertical in nature, Natarajan concluded that someone had attempted to open Y.C.'s mouth too far by exerting a thrusting downward pressure. Natarajan was also of the opinion that someone had tried to thrust or push a foreign object, such as a finger, through Y.C.'s rectal opening. Natarajan believed that Y.C. had been alive when this attempt was made based upon the location of the swelling and the hemorrhage.[3]
After defendant's arrest, the Office of the Public Defender consulted Dr. Dominick DiMaio and asked that he review Natarajan's findings. DiMaio issued a one-page report that indicated that he reviewed "various reports", but did not suggest that he had examined the autopsy photographs or the tissue samples. Nevertheless, DiMaio concluded (1) that the injuries to the child's face and head were consistent with having been struck by an open hand and fist; and (2) that "the anal injuries were not due to insertion of a finger" but were "most consistent with sodomy due to insertion of a penis or foreign body".
*113 After defendant obtained private counsel, his new attorney elected not to use DiMaio and instead retained Dr. Claus Speth, a forensic pathologist, who eventually prepared a forty-page report, and testified for defendant at trial. In that report he indicated that he had been given DiMaio's report and he outlined DiMaio's findings. He did not mention DiMaio's report in his direct testimony.
Speth had previously been the Gloucester County Medical Examiner. However, he admitted on cross-examination during voir dire concerning his qualifications that his eligibility to work as a medical examiner had been withdrawn in 1992 because of alleged deficiencies in the performance of his duties in that office. He testified that he had denied the allegations of wrongdoing, had asked for a hearing, and the matter was in litigation.
On direct examination Speth disagreed with Natarajan's conclusions. He rejected her conclusion that Y.C. had sustained an injury to the top of her head and that her forehead injury was an impact injury. He concluded that the marks on Y.C.'s left cheek were actually due to pressure from lying face-down and decomposition rather than from a blow to the face. He opined that Y.C.'s jaw bone fractures could have occurred as a result of a forceful opening of her mouth. He expressed his belief that the fractures were really "green stick fractures" which resulted from defendant either falling or rolling on top of Y.C. He rejected Natarajan's conclusion that an object had been forcefully put in Y.C.'s anus. He concluded that while Y.C. had sustained some injuries, it did not appear that these injuries had resulted from having been beaten or that they had caused her death. He suggested that Y.C.'s injuries were more consistent with being crushed, insisting that there was no evidence that she had been dropped. He opined that the actual cause of death was dehydration, coupled with injuries of a nonlethal nature.
At the outset of his cross-examination of Speth, the prosecutor asked whether DiMaio had reviewed Natarajan's autopsy report and agreed with her conclusions. Defense counsel immediately objected, asserting at sidebar that Speth did not rely upon DiMaio's report in reaching his conclusions and that it was "otherwise non-discoverable material". Defense counsel conceded that Speth had mentioned DiMaio's findings and conclusions in his report. Accordingly, the trial judge permitted the cross-examination. Thereafter, the prosecutor elicited from Speth the fact that DiMaio was the former Chief of the New York City Medical Examiner's Office; was the Chief of the Brooklyn Office for a number of years; and that DiMaio had been retained by defendant's first attorney to review Natarajan's conclusions. In cross-examining Speth, the prosecutor then elicited from him DiMaio's conclusions, which we have already described. The prosecutor concluded his questioning of Speth by having him acknowledge that DiMaio and DiMaio's son had written a "[v]ery respected, excellent" book on pathology.
The prosecutor subsequently revisited the subject of DiMaio's report during his summation as follows:
So Dr. DiMaio ... agrees with everything Dr. Natarajan says. He wrote the book on forensic pathology or a book well-respected, says Dr. Speth, the Chief Medical Examiner in Brooklyn, New York, for a number of years, the Chief of the New York City Medical Examiner's Office. Dr. Speth, the Shell Answer Man, has an answer for everything, says that it was all politics but, at least, he was the acting or was the head for some period of time for New York City.
The rectum, Dr. DiMaio, consistent with a large object like the penis going into the rectum. Dr. Speth says this thing about some piece of tissue that he doesn't see injury to five years later looking at the pictures, although he did say, ... he said maybe the pinky could go in there without injuring that. Okay?
Dr. Natarajan saw the body, she had no axe to grind ...
* * * * * *
And you saw the photos. Sometimes juries don't see the photos like this. But when an autopsy is contested, you see these things. You will see bone, it's bone, bone, and you will see the crack. Who do *114 you believe what happened to that jaw? I don't mean to be silly or anything but who would you buy a used car from, Dr. Speth, the suspended guy,[4] or Dr. Natarajan, the Acting State Medical Examiner and Dr. DiMaio, the former Chief of the New York City Medical Examiner's Office?
We conclude that the prosecutor's cross-examination of Speth which elicited for the jury the opinion of DiMaio, who did not testify and was not subjected to cross-examination, coupled with the improper use of that cross-examination on his summation deprived defendant not only of his constitutional right to confront a witness, but also his constitutional right to a fair trial. Accordingly, we reverse.
Expert testimony is authorized where scientific or specialized knowledge will assist the trier of fact to determine a fact in issue. See N.J.R.E. 702; State v. Clowney, 299 N.J.Super. 1, 19, 690 A.2d 612 (App.Div.), certif. denied, 151 N.J. 77, 697 A.2d 549 (1997). The very premise which makes expert testimony admissible, namely its esoteric, abstruse, and special nature, subjects it to legitimately expansive cross-examination in order to enable the jury to assess its soundness. State v. Clowney, supra, 299 N.J.Super. at 19, 690 A.2d 612. Accordingly, on cross-examination, an expert may be required to disclose the underlying facts or data upon which he relied. State v. Pennington, 119 N.J. 547, 583, 575 A.2d 816 (1990). See also N.J.R.E. 705. This disclosure requirement also extends to inadmissible evidence such as hearsay, upon which experts are permitted to rely provided the evidence is "of a type reasonably relied upon by experts in a particular field in forming opinions upon the subject" at issue. N.J.R.E. 703. However, hearsay evidence not relied upon by an expert may not be employed on cross-examination. See State v. Pennington, supra, 119 N.J. at 583, 575 A.2d 816. Moreover, although the cross-examiner may inquire as to whether the expert relied upon certain hearsay evidence, upon receipt of a negative response, the details of that particular evidence may not be used as the basis for further cross-examination. Ibid. The mere fact that Speth, in his report, mentioned DiMaio's findings and conclusions did not render the contents of DiMaio's report admissible in view of Speth's testimony that he disagreed with them and did not rely upon them in reaching his own conclusions. Nonetheless, through the vehicle of cross-examination Speth was improperly required to inform the jury of hearsay it was not otherwise permitted to hear. See State v. Burris, 298 N.J.Super. 505, 512, 689 A.2d 860 (App.Div.1997).
We reject the State's argument that DiMaio's report was not hearsay since it was not offered for the truth of the matter asserted, but rather only to impeach the credibility of the witness by virtue of its simple existence. See N.J.R.E. 801(c). Not only did the prosecutor by that device elicit the contents of DiMaio's report, but he also brought out the fact that DiMaio's conclusions agreed with Natarajan's. In addition, on summation, he stressed the qualifications of DiMaio and compared them with Speth's qualifications and status, including his current status. We regard the prosecutor's action as having unfairly and improperly undermined Speth's testimony.
We conclude that the improper cross-examination of Speth which brought to the attention of the jury the opinion of DiMaio, who did not testify and which was consistent with the State's expert, had the clear capacity to unfairly tip the scales in favor of the State, particularly in light of the prosecutor's summation that highlighted the differences between the eminent qualifications of DiMaio and the then current status of Speth.
In addition, although not argued by defendant on appeal, we conclude that the State's improper use of DiMaio's report subverted defendant's right to the effective assistance of counsel guaranteed him by the Sixth Amendment of the United States Constitution and by Art. I, par. 10 of the New Jersey Constitution and independently necessitates reversal of defendant's convictions. The constitutional right to counsel comprehends *115 the right to the effective assistance of counsel. State v. Mingo, 77 N.J. 576, 581, 392 A.2d 590 (1978). To safeguard the ability of an attorney to provide effective assistance to his client it is essential that he be permitted full investigative latitude in attempting to develop a meritorious defense for his client. Id. at 582, 392 A.2d 590. That latitude is circumscribed if defense counsel must risk a potentially crippling revelation to the State, by way of discovery, of information uncovered in the course of investigation which counsel does not intend to use at trial. Ibid. Accordingly, a defense attorney must have the right to seek out expert evidence without risking its disclosure to the State if the expert's opinion turns out to be unfavorable to the defense. Ibid. Although we cannot discern from the record how the State obtained the report of DiMaio, that fact is of no consequence since the right to the effective assistance of counsel is clearly subverted if an expert report obtained for defense purposes by defense counsel is discovered by the State and utilized by it, either directly or indirectly, at trial, when the expert was not used by defendant at trial. Id. at 584, 392 A.2d 590. In objecting to the cross-examination of Speth regarding DiMaio's conclusion, defense counsel correctly argued that DiMaio's report was not discoverable since he did not intend to use DiMaio at trial. See Id. at 586, 392 A.2d 590. The rule declaring reports of experts consulted by defendants in a criminal prosecution immune from discovery and testimony when the expert will not testify as a witness for the defense and whose report will not be utilized as evidence is designed to provide effective representation by affording counsel the utmost freedom in seeking the guidance of an expert without fear that any unfavorable material so obtained will be used against defendant. Id. at 587, 392 A.2d 590. Likewise, here, defendant's right to the effective assistance of counsel was undermined when the State was improperly permitted to cross-examine Speth regarding DiMaio's report and to further comment upon it in summation. To hold otherwise might discourage counsel from seeking expert assistance. Accordingly, we conclude that the protection from the unwarranted disclosure or use of the report of an expert consulted by defense counsel which will not be used by defendant at trial is an indispensable element of defendant's constitutional right to the effective assistance of counsel. Ibid. See also State v. Williams, 80 N.J. 472, 478-79, 404 A.2d 34 (1979) (trial judge committed reversible error in granting the State's motion to discover photographs used and memoranda made of interviews between defense counsel and the victim during which the victim identified a photograph of defendant where defense counsel did not intend to use the inculpatory information at trial; such compelled discovery violated defendant's right to the effective assistance of counsel).
Although we have concluded that defendant's convictions must be reversed, we consider the remaining issues raised by defendant on appeal for guidance of the parties on retrial.
In support of the defenses of insanity and diminished capacity, defendant called a psychiatrist, Dr. Stephen Teich, as a witness. Based upon his evaluation, Teich testified that at the time of Y.C.'s death, defendant was limited by his low IQ and was also suffering from a mental illness which interfered with his thinking, such that he did not know right from wrong and could not make appropriate judgments concerning his behavior. Teich was also of the opinion that defendant was depressed and suffering from chronic post-traumatic stress disorder. In attempting to challenge the validity of Teich's conclusion that defendant suffered from severe depression, the prosecutor asked Teich whether he was aware of reports that defendant was having sexual relations in jail with a female officer. The cross-examination was improper. Although counsel is customarily given considerable latitude in the cross-examination of witnesses, that latitude is subject to limits reasonably imposed by the trial court in the exercise of its sound discretion. See State v. Rose, 112 N.J. 454, 499, 548 A.2d 1058 (1988). There was no indication that Teich relied on that information in coming to his conclusions. An expert may be asked on cross-examination to disclose the underlying facts or data he relied upon. N.J.R.E. 705. However, as discussed above, hearsay evidence *116 which has not been relied upon by the expert may not be employed on cross-examination. See State v. Rose, supra, 112 N.J. at 499-500, 548 A.2d 1058. In addition, the cross-examination is improper if it is unrelated to the expert's opinion or to the material upon which the expert has relied, is not based on evidence in the record, and the prosecutor has made no proffer that he could prove the underlying events. See State v. Pennington, supra, 119 N.J. at 578, 575 A.2d 816. Of course, even if the cross-examiner makes a proffer of the facts he intends to prove, those facts must be relevant. On remand the prosecutor shall not cross-examine defendant's experts about the details of incidents on which the experts did not rely. The prosecutor may elicit whether the expert relied on any such evidence, but in the face of a denial, may not use the details of that evidence as the basis of further cross-examination. Id. at 583, 575 A.2d 816.
We next consider defendants contention that he was unduly prejudiced when the trial court permitted L.C. to present hearsay evidence regarding defendant's alleged prior mistreatment of Y.C. Additionally, defendant contends that this error was compounded when the trial judge later refused to permit defense counsel, in an effort to demonstrate L.C.'s bias against defendant, to question L.C. regarding his efforts to have defendant killed by a fellow inmate. Before L.C. took the stand, defense counsel advised the judge that he objected to any mention of an argument between L.C. and defendant regarding Y.C.'s care. The argument occurred on the night defendant took the child from D.C. At a sidebar conference regarding the objection, the prosecutor indicated that the witness would say "that he had heard that the baby was being mistreated by [defendant]". The judge ruled that testimony inadmissible. The prosecutor acquiesced in that ruling and then indicated that he wished to bring out the fact that L.C. and defendant had an argument and that L.C. told defendant "to take care of the baby, better care of the baby". The judge indicated he would allow that testimony.
However, during direct examination of L.C. after he testified that defendant came to the home to pick up the baby he said he went outside and "had words with him." The following exchange occurred:
Prosecutor: And just tell us what you said to him?
L.C.: I had told him that I found out what he was doing to the baby by his sister.
The Court: No, no. Don't tell us anything but what the prosecutor just asked. He said: Tell us what you said to him.
L.C.: That is what I am telling him what I said to him.
Prosecutor: Did you tell him to do anything or not to do anything?
L.C.: No. When he, what I say to him, I told him out what his sister ...
Prosecutor: Don't tell us ... just tell us... did you tell him to do anything or not to do anything?
L.C.: No, I didn't tell him to do nothing.
* * * * * *
Prosecutor: If I could lead here, judge?
The Court: Ask the question and I will rule on it.
Prosecutor: OK.
Prosecutor: Did you tell him to take better care of the baby?
The Court: I will allow that question.
L.C.: Yes.
Just before defense counsel began his cross-examination of L.C., he advised the court that he intended to ask the witness whether he had attempted to arrange a contract with William Adams to have defendant killed while in jail. Defense counsel explained that he had learned of L.C.'s efforts in this regard from defendant who claimed to have discussed the matter with Adams, a fellow inmate awaiting trial on pending murder charges. Although defense counsel insisted that he had a good faith basis to impeach L.C. in this matter, the trial judge disagreed and refused to permit the question. Significantly, defense counsel did not state that Adams would testify on behalf of defendant.
The trial judge correctly sustained defendant's objection to testimony from L.C. as to information he received from *117 defendant's sister regarding prior mistreatment of Y.C. That testimony was inadmissible hearsay which was offered to prove the truth of the matter allegedly asserted by defendant's sister. See N.J.R.E. 801(c). A specific hearsay statement is not always required in order to implicate the rule against hearsay evidence. If the evidence elicited tends to create an impermissible inference of guilt based upon a statement made by someone other than a witness at the trial it is inadmissible. See State v. Bankston, 63 N.J. 263, 271, 307 A.2d 65 (1973); State v. Torres, 313 N.J.Super. 129, 157, 713 A.2d 1 (App.Div.1998). On retrial we direct that the prosecutor not attempt to elicit this inadmissible hearsay through L.C. Moreover, we conclude that the testimony of L.C. that he told defendant to take better care of the baby is irrelevant and should not be elicited, particularly since the question suggests that L.C. is aware of information not placed in evidence which would suggest mistreatment of the child by defendant.
In addition, we agree with the trial judge that the proposed cross-examination of L.C. regarding efforts he may have made to have defendant killed by a fellow inmate was inadmissible. Without question a defendant must be given the opportunity through effective cross-examination to show bias on the part of an adverse witness. See State v. Sugar, 100 N.J. 214, 230, 495 A.2d 90 (1985). Although the right to effective cross-examination to test for bias at a criminal trial is indispensable, ibid., it is not without limitations. The cross-examiner does not have a license to roam at will under the guise of impeaching the witness. State v. Pontery, 19 N.J. 457, 473, 117 A.2d 473 (1955). For example, the cross-examiner may not ask a potentially inflammatory question without a good faith basis to support the question. The question must be based upon facts in evidence or based upon a proffer by the cross-examiner indicating his ability to prove the facts contained in the question. See State v. Rose, supra, 112 N.J. at 500, 548 A.2d 1058. The reason for this rule is that the question of the cross-examiner is not evidence and yet suggests the existence of evidence tending to show bias which is not properly before the jury. Accordingly, on retrial, if L.C. testifies, defendant shall not be permitted to cross-examine him regarding attempts to hire Adams to kill defendant unless he is prepared to prove that fact through the testimony of Adams or other competent evidence.
We next consider defendant's contentions, raised for the first time on appeal, that the trial judge committed reversible error by failing to properly charge the jury on both aggravated sexual assault and felony murder. According to defendant, based upon the evidence presented, the judge should have instructed the jury to acquit defendant of both aggravated sexual assault and felony murder if the evidence raised a reasonable doubt that the sexual penetration occurred hours after Y.C. was killed. Natarajan testified that Y.C. was alive at the time the injuries to her anus and rectum were inflicted. At trial it was defendant's position that there was no sexual assault. In light of that fact, in the absence of a request from counsel, we conclude that the trial judge did not err in not instructing the jury that it may not convict defendant of aggravated sexual assault and felony murder if it had a reasonable doubt that the sexual penetration occurred hours after death. That instruction was not clearly indicated by the evidence. See State v. Grunow, 102 N.J. 133, 148, 506 A.2d 708 (1986). Moreover, such an instruction may have preempted defense counsel's strategic and tactical decision and possibly prejudiced defendant's chances of an acquittal. See State v. Perry, 124 N.J. 128, 162, 590 A.2d 624 (1991). However, we observe that in defendant's second statement to the police he said he was not sure Y.C. was alive when the sexual assault took place. We have recently held that a rape-murder victim must be alive at the time the assaultive behavior begins in order to support a conviction of aggravated sexual assault or felony murder predicated upon that aggravated sexual assault. See State v. Jones, 308 N.J.Super. 174, 189, 705 A.2d 805 (App.Div.), certif. denied, 156 N.J. 380, 718 A.2d 1209 (1998). However, the victim need not be alive at the time of penetration. Ibid. When a sexual assault is committed as part of one continuous transaction, the status of the victim at *118 the time of penetration is irrelevant. Id. at 189-90, 705 A.2d 805. The prosecution must show that the victim was alive when the series of assaults began which ultimately resulted in the act of sexual penetration charged, but need not show that the victim was still alive at the completion of the sequence of events. Id. at 190, 705 A.2d 805. The mere fact that the victim might have been dead by the time the act of penetration occurred does not detract from the actor's culpability provided the sexual assault is part of a continuous transaction. Id. at 189-90, 705 A.2d 805. On retrial, if defendant so requests, the trial judge should instruct the jury that in order to convict for felony murder or aggravated sexual assault or sexual assault, the victim must have been alive at the time the assaultive behavior began, but not necessarily at the time of penetration. See State v. Jones, supra.
Finally, we consider defendant's contention, again raised for the first time on appeal, that the jury charge on felony murder was overbroad and that the jury should have been instructed that it could not convict defendant of felony murder if it found that he killed Y.C. after reaching a place of temporary safety. The trial judge instructed the jury that in order to convict defendant of felony murder, the State had to prove beyond a reasonable doubt:
1. That on or about March 10, 1989, the defendant was engaged in the commission of or attempt to commit or flight after committing or attempting to commit the crime of aggravated sexual assault;
2. The death of [Y.C.] was caused by the defendant; and
3. That the death of [Y.C.] was caused at some time within the course of the commission of that crime including its aftermath of flight and concealment efforts.
According to our felony murder statute, an individual who is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit ... sexual assault, and in the course of such crime or of immediate flight therefrom ... causes the death of a person is guilty of felony murder. See N.J.S.A. 2C:11-3(a)(3). Defendant contends that to the extent that the jury instruction would allow a defendant to be convicted of a killing done in the "aftermath of flight and concealment efforts", it is legally erroneous since it extends criminal liability beyond the defendant's "immediate flight" from the sexual assault and permits the jury to convict defendant if he was still involved in "the aftermath of flight and concealment efforts". Defendant contends that felony murder does not extend to the "aftermaths of flight and concealment" of the crime. Defendant also contends that he cannot be deemed to be in immediate flight after the commission of the offense if he has reached a place of temporary safety before the killing. We reject both contentions.
We agree with defendant that N.J.S.A. 2C:11-3(a)(3) does not specifically define felony murder as a homicide committed during any "concealment efforts" undertaken after the commission of a predicate offense. Such specific language was also not incorporated into N.J.S.A. 2A:113-2 which is the precursor statute to N.J.S.A. 2C:11-3(a)(3). Nevertheless, case law interpreting that statute recognized that a killing which occurred within the course of committing the predicate offense, including its aftermaths of escape and concealment efforts, constituted felony murder if they were so closely connected with the offense as to be a part of the res gestae. See State v. Artis, 57 N.J. 24, 32, 269 A.2d 1 (1970); State v. Holland, 59 N.J. 451, 458, 283 A.2d 897 (1971); State v. Gimbel, 107 N.J.L. 235, 241, 151 A. 756 (E & A 1930); and State v. Turco, 99 N.J.L. 96, 102, 122 A. 844 (E & A 1923). When the predicate offense and the murder are closely connected in point of time, place and causal connection and are integral parts of one continuous transaction, the actor may be found to be engaged in the course of committing, or attempting to commit the predicate offense or in immediate flight thereafter so as to justify a conviction for felony murder. See State v. Mirault, 92 N.J. 492, 500, 457 A.2d 455 (1983). We recognize that in dictum in Mirault, supra, the Supreme Court suggested that in a felony murder case related to robbery the actor may no longer be in immediate flight if he has reached a point of at least temporary safety. However, we conclude *119 that that is just one factor for the jury to consider in determining whether they are satisfied beyond a reasonable doubt that the homicide occurred while the actor was engaged in the commission of, or an attempt to commit the predicate offense, or in immediate flight therefrom. For example, if a person kidnaps a victim in New Jersey and immediately transports the victim to New York to escape and forces the victim into a hotel room where he assaults and kills the victim, can it reasonably be argued that he is not in immediate flight after the commission of the offense because the hotel room constitutes a place of temporary safety. We think not. Here, although defendant's home could be considered a place of temporary safety, the fact remains that the victim remained in his custody at all times prior to her death. On retrial, the trial judge should tailor the charge to the facts of the case.[5] At retrial, the trial judge must instruct the jury that in order to conclude that the death occurred during the course of the commission, or attempt to commit the predicate offense, or in immediate flight thereafter, the jury must unanimously conclude beyond a reasonable doubt that the predicate offense and the homicide are so closely connected in point of time, place and causal connection that they are integral parts of one continuous transaction. Moreover, the trial judge must also instruct the jury that it may not convict defendant of felony murder unless they also convict defendant of the predicate offense or an attempt to commit the predicate offense. See State v. Grey, 147 N.J. 4, 16, 685 A.2d 923 (1996).
Reversed and remanded for a new trial on all counts.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Central Judicial Processing Courts exist in some counties. In CJP all first appearances required by R. 3:4-1(c) and R. 3:4-2 are conducted before a single judge regardless of which municipality the offense occurred.
[3] Ricardo Gonzales, an investigator with the Public Defender's Office, testified at trial that he met with Natarajan who stated she was unable to tell whether the sexual assault or the blunt force trauma had occurred first. Additionally, he said that she could not state with any degree of certainty how much time elapsed between the sexual assault and the blunt force trauma.
[4] The reference to Dr. Speth as being suspended was the subject of an extensive in limine hearing where it was agreed that Dr. Speth's status would not be referred to as a suspension.
[5] It would be extremely helpful if the parties would submit written requests to charge pursuant to R. 1:8-7(a) and suggest proposed charges based upon the evidence at a charge conference pursuant to R. 1:8-7(b).