**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2850-15T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

L.M.W.,

    Defendant-Appellant,

and

J.R., (deceased),

    Defendant.
_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.R., a
Minor.
_____

        Argued September 26, 2017 — Decided October 25, 2017

        Before Judges Reisner, Hoffman and Mayer.

        On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0019-14.

        Anastasia P. Winslow, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ms. Winslow, on the briefs).

Victoria A. Galinski, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Galinski, on the brief).

Christopher A. Huling, Designated Counsel, argued the cause for the minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Mr. Huling, on the brief).

PER CURIAM

Defendant L.M.W.[1] appeals from a February 2, 2016 judgment of guardianship terminating her parental rights to her five-year-old son, J.R. The Division of Child Protection and Permanency (Division) and J.R.'s Law Guardian argue in support of the judgment.

Defendant's brief raises the following points of argument:

POINT ONE

THE TRIAL COURT ERRED IN FINDING THAT DCPP HAD PROVED ALL FOUR PRONGS OF THE TERMINATION STATUTE BY CLEAR AND CONVINCING EVIDENCE.

(1)  The trial court erred in ruling that DCPP proved prong one by clear and convincing evidence.

(2)  The trial court erred in ruling that DCPP proved prong two by clear and convincing evidence.

(3)  The trial court erred in ruling that DCPP proved prong three by clear and convincing evidence.

(a)  The trial court erred in finding there were no alternatives to termination.

---

[1] We use initials and pseudonyms to protect the family's privacy.

A-2850-15T4

(4)   The trial court erred in ruling that DCPP proved prong four by clear and convincing evidence.

POINT TWO

THE TRIAL COURT ERRED IN TERMINATING L.M.W.'S PARENTAL RIGHTS AS ITS DECISION WAS BASED ON HEARSAY THAT WAS RULED INADMISSIBLE.

POINT THREE

THE TRIAL COURT ERRED IN ADMITTING AND RELYING UPON OPINIONS BY MRS. DEVINE AND DR. CRAIG AS THEY WERE NOT QUALIFIED AS EXPERTS AND THEIR OPINIONS ON L.M.W.'S PARENTING CAPABILITIES WERE NOT RELIABLE (NOT RAISED BELOW).

POINT FOUR

L.M.W. WAS DENIED HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL (RAISED PURSUANT TO R. 2:10-6).

   A. DCPP records, L.M.W.'s educational records, and witness testimony, not disclosed to the trial court, undermine confidence in the trial court's rulings on all four prongs of the best-interests test.

Following our review of the record, we reject these arguments and affirm.

I.

We begin with a summary of the standards that guide our review. Parents have a fundamental right to raise their children, and that right is constitutionally protected. N.J. Div. of Youth and Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "[T]erminations should be granted sparingly and with great caution because they irretrievably impair imperative constitutionally-protected liberty interests and scores of centuries of societal

family constructs." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014). However, a parent's rights are not absolute. Ibid. "Because of its parens patriae responsibility, the State may terminate parental rights if the child is at risk of serious physical or emotional harm or when necessary to protect the child's best interests." Id. at 553-54.

In order for the court to terminate parental rights, the State must satisfy the following prongs of the "best interests of the child" test with clear and convincing evidence:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his [or her] resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The four prongs "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests," with parental fitness being the crucial issue. In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). Determinations of parental fitness are very fact sensitive and require specific evidence. Ibid. Ultimately, "the purpose of termination is always to effectuate the best interests of the child, not the punishment of the parent." Id. at 350.

On this appeal, our review of the trial judge's decision is limited. R.G., supra, 217 N.J. at 552. We are bound to accept his or her factual findings, as long as they are "supported by adequate, substantial, and credible evidence." Ibid. Additionally, we accord her decision particular deference "[b]ecause of the family courts' special jurisdiction and expertise in family matters," and because the judge was uniquely in a position to evaluate the credibility of the witnesses. Cesare v. Cesare, 154 N.J. 394, 412-13 (1998). However, we review the trial court's legal interpretations de novo. R.G., supra, 217 N.J. at 552-53.

## II.

We next summarize the relevant facts and procedural history from the record. A child of abusive parents, defendant suffers from serious cognitive impairments. In 2012, she gave birth to

J.R at the age of seventeen. The Division became involved when J.R. was only four months old, following a domestic violence incident between defendant and J.R.'s now-deceased father.

On August 28, 2012, the Division filed a verified complaint and order to show cause for care and supervision of J.R. under Title Nine, N.J.S.A. 9:6-8.21 to -8.73. The court entered a consent order the same date granting the Division's application. On January 18, 2013, the Division filed an amended verified complaint for custody under Title Nine. The court granted the Division custody of J.R., finding his removal was required to avoid ongoing risk to his life, safety or health. In February 2013, doctors diagnosed then one-year-old J.R. with failure to thrive, resulting in his placement with a non-relative resource family, where he remains today.

Over the next year, the Division provided defendant with various services in an effort to reunite defendant with J.R., without success. On January 21, 2014, the Division filed a complaint for guardianship of J.R.; however, on January 26, 2015, the trial judge dismissed the guardianship complaint and reinstated the Title Nine action in favor of reunification.

After the court dismissed the guardianship action, concerns soon arose about defendant's ability to address J.R.'s complicated medical and emotional needs, following J.R.'s three-year-old well

visit with J.R.'s pediatrician, Dr. Krekamey Craig, on February 12, 2015. In preparation for the visit, the case worker gave defendant, who had never met Dr. Craig, a list of questions to ask.

Dr. Craig, who had been treating J.R. for approximately two years, was "sympathetic" to the fact that defendant had not been J.R.'s primary caretaker and thus tried to use the visit as an educational opportunity for defendant. Dr. Craig explained to defendant that J.R.'s most pressing medical condition was his reactive airway disease, for which he had been hospitalized and was under the care of a pulmonologist. Dr. Craig listed the medications that J.R. needed to take on a regular basis to avoid relapses, what warning signs to look for, and when these symptoms required emergency treatment. While defendant initially communicated she understood what she needed to do, upon further questioning by Dr. Craig, it became clear that she did not.

As a result, Dr. Craig asked defendant to write down the information so they could review what she needed to do on a regular and emergency basis. While defendant complied, it was evident to Dr. Craig she did not understand. Dr. Craig told the caseworker that she was worried that defendant was not capable of properly addressing J.R.'s complicated medical and emotional needs. The caseworker requested Dr. Craig to "write up" her concerns.

A-2850-15T4

On the following day, Dr. Craig, who explained she generally did not "write letters like this," wrote to the Division and reported that she "was disturbed" by the well visit and had concerns with defendant's ability to understand J.R.'s medical needs, particularly his asthma, a life-threatening condition. She also reported that defendant had not effectively interacted or disciplined J.R., who needed "continued monitoring" because of his developmental delays.

Additional concerns arose on February 25, 2015, when defendant tested positive for marijuana use. Defendant admitted she had used marijuana about three times a month and had engaged in underage drinking.

Further concerns regarding defendant's ability to protect J.R. arose during a February 2015 home visit, when a caseworker observed J.R. pick up a pocketknife and a lighter that defendant had left on top of her dresser. That same month, defendant posted photos on social media, which revealed she had failed to transport J.R. in a car seat, even though she received specific instructions to do so.

Moreover, in a report dated March 4, 2015, Dr. Heidi Jacobsen, defendant's treating clinical psychologist, expressed "significant concern" about the reunification plan, noting that defendant had missed four of her five scheduled therapy appointments, had not

A-2850-15T4

scheduled transportation with the Division's transportation provider as she had agreed to do, and had tested positive for marijuana use. Defendant had also admitted that "in the past she had hidden [T.C.][2] in [her] closet" when the caseworker came to her home. Based on this conduct, together with defendant's inability to understand J.R.'s medications and symptoms, Dr. Jacobsen recommended termination of defendant's unsupervised visits and that her contact with J.R. be "fully supervised" to ensure his safety. Based on these developments, the court issued an order on March 11, 2015, granting the Division's application to reinstate the guardianship complaint and to terminate defendant's unsupervised visitation.

At the guardianship trial, which began on July 28, 2015, the Division presented testimony from Dr. Jacobsen, Dr. Mark Singer (the Division's expert psychologist), and two caseworkers. In addition, the Law Guardian, who supported the Division's position, presented the testimony of Dr. Leslie Trott, a licensed psychologist. At the conclusion of the Division's case, the trial judge sua sponte found the Division had not, at that point, "proved prong two [N.J.S.A. 30:4C-15.1(a)(2)] by clear and convincing

---

[2] Defendant started dating T.C. in June of 2014. Because he had an open child abuse case with the Division, the court previously entered an order that T.C. "is not to have any contact with [J.R.]."

evidence." The judge therefore suspended the guardianship trial and ordered further services and updated evaluations to determine whether defendant could progress to the point that "she can meet minimum standards of parenting."

After these further efforts proved unsuccessful, the guardianship trial resumed on December 1, 2015, with the Division presenting further testimony from Dr. Singer and Dr. Jacobsen, and also defendant's former caseworker, who described photographs of J.R. and T.C. together that defendant posted on social media. The Division also called a social worker from J.R.'s school, who agreed that J.R. needs constant, "one-on-one attention." Dr. Craig, defendant's current caseworker and one of J.R.'s therapists also testified. Defendant then testified on her own behalf, but did not present any other witnesses, expert or otherwise.

After two full days of trial testimony, Judge James A. Farber issued a comprehensive oral opinion finding that the Division proved by clear and convincing evidence each of the four prongs of the best interests standard, N.J.S.A. 30:4C-15.1(a), and entered a final judgment terminating defendant's parental rights to J.R.

With regard to prong one, the judge found that the Division demonstrated that J.R.'s safety had been and will continue to be endangered by the parental relationship with defendant. While the

judge did not attribute any malice to defendant, he found "[h]er inability to understand basic calls from a child for feeding[,] and the proper amounts" a child needs to eat, caused J.R.'s "medical issues." Specifically, he found the record "replete with information that [J.R.'s] failure to thrive and the domino consequences of the failure to thrive are directly related and attributable to [defendant]." The judge further found defendant caused harm because she failed to respond adequately to J.R.'s hearing impairment, which triggered his speech and cognitive delays. The judge concluded that J.R.'s health and development "were both severely impaired by [defendant's] own cognitive deficiencies[,] which prevented her from recognizing warning signs in various arena."

The judge found that this harm will continue because defendant does not understand J.R.'s medical condition and emotional needs, citing her inability "to decipher what medications should be administered in what doses and when." The judge referenced the findings of Dr. Singer and Dr. Trott describing defendant as "narcissistic and histrionic;" consequently, she would not place J.R.'s needs above her own and would overreact to issues impeding her "already-suspect judgment." While the judge found defendant can handle "concrete tasks," she cannot "develop or implement an appropriate plan" to address unexpected issues. The judge further

A-2850-15T4

explained,

> Again, this child is a special needs child who will have medical issues and educational issues to be addressed periodically and consistently. [Defendant] is quite simply unable to navigate those matters which . . . will endanger [J.R.'s] safety, health, and development. If a co-parent or some other adult is not there, will [J.R.] play with knives, lighters, or matches left accessible to him? What other everyday materials or substances which are poisonous and lethal when ingested will be left available to this child when [defendant's] back is turned?

With regard to prong two, the judge found defendant unable or unwilling to eliminate the harm facing J.R. and that delaying placement will add to the harm because J.R. needed permanency. After three years of therapy, defendant had not corrected the issues that led to J.R.'s removal — she still could not adequately provide for J.R.'s medical and emotional needs. Instead, she "would be quickly overwhelmed" by full-time or part-time parenting "due to judgment deficits and her difficulty in addressing additional stressors."

Regarding prong three, the judge found the Division had provided defendant with reasonable services to further the goal of reunification, including enhanced supervised visitation, transportation, therapy, parenting classes, referrals to residential programs, evaluations, employment and educational

12

training, and assistance with grocery shopping and basic child care skills. Additionally, the judge considered alternatives to termination of defendant's parental rights, but all proposed relatives had been ruled out.

Finally, with regard to prong four, the judge found that termination of defendant's parental rights will not do more harm than good. The judge concluded J.R. lacks "a healthy relationship" with defendant, "who does not provide the nurturance and structure that [J.R.] demands." The judge further concluded that severing J.R.'s relationship with defendant "would not cause severe or enduring harm," but severing his relationship with the resource parent, who has become his psychological parent, would cause severe and enduring harm, which defendant "would not be able to mitigate."

As noted, we owe deference to Judge Farber's decision, unless it was not supported by sufficient credible evidence or was otherwise "so wide of the mark that a mistake must have been made." N.J. Div. of Youth and Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citation omitted). Having reviewed the record in light of that standard, we find no basis to disturb the judgment on appeal. We affirm for the reasons stated by Judge Farber in his oral opinion issued on February 2, 2016, and for the reasons stated in this opinion. Defendant's appellate arguments are not supported

13

by the record and are without sufficient merit to warrant discussion beyond the following comments. R. 2:11-3(e)(1)(E).

Of note, notwithstanding the Division's efforts to provide defendant with needed services, the experts at trial all agreed defendant remains incapable of safely parenting J.R., who has his own special medical and behavioral needs. The experts also agreed a close bond exists between J.R. and his resource parent, who wants to adopt, and severing that relationship would cause severe and enduring harm.

Due to her own serious cognitive impairments, defendant is barely able to care for herself, much less care for a child with his own special needs. Defendant's inability to overcome her cognitive impairments resulted in her son's placement in foster care, where he remains today. The child has now bonded with his foster parent, and he would sustain severe harm if he were removed from her care. His need for a permanent, stable home is paramount, and termination of defendant's parental rights is in his best interests.

Finally, we address defendant's argument, raised in her point IV, that she was denied the effective assistance of counsel, because her counsel: 1) failed to adequately review the Division's file; 2) failed to call an expert witness at trial; and 3) failed to advocate for services consistent with the guidelines set forth

by the United States Department of Health and Human Services (HHS) and the United States Department of Justice (DOJ) to assist state child welfare agencies in protecting the civil rights of parents with disabilities. Because the trial court did not consider this issue, since Rule 2:10-6 provides the issue of ineffective assistance of counsel "shall be raised in the direct appeal" of guardianship matters, we address defendant's claims of ineffective assistance in some detail.

We initially note that defendants are entitled to the effective assistance of counsel in termination of parental rights proceedings. N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 305-07 (2007); N.J.S.A. 30:4C-15.4(a). In order to establish such a claim, a parent must prove the two-part test established in Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674, 697 (1984), specifically: (1) counsel's performance was deficient, that is, it was outside the wide range of reasonable professional assistance; and (2) counsel's deficiency prejudiced the defense, that is, there is a reasonable probability that counsel's errors changed the result. B.R., supra, 192 N.J. at 308-09.

Here, appellate counsel argues that trial counsel failed to inspect the Division's entire file since she found several documents that were not included as trial exhibits. This claim

lacks merit. From our review, even if trial counsel was deficient in failing to review those documents (as opposed to simply deciding not to use them), that deficiency would not have changed the result of this case, because either: 1) the facts contained in the documents were otherwise admitted into evidence through the testimony of Division witnesses, or 2) the facts were not relevant to a material issue.

Appellate counsel next contends that defendant's trial counsel failed to call Ally Wise, the director of Family Promise, who would have testified as to various shortcomings with the Division's educational services. Wise set forth in a certification that she "did not appreciate the extent of [defendant's] disability" at the time of her admission because the Division had failed to disclose that defendant "has a learning disability or special education needs." Wise claims she did not discover the "magnitude" of defendant's "learning deficits" until July 2013 (two months after her admission), at which time she requested to have defendant attend an extensive private GED tutoring program at a cost of $10,000. The Division denied that request and instead arranged GED tutoring for defendant's cognitive impairments through a volunteer organization. Wise claimed that to the best of her knowledge, the Division "did not at any time recommend or suggest that [defendant] have services implemented that would

accommodate her learning disability."

Here, even if trial counsel was deficient in failing to call Wise, we discern no basis to conclude the outcome in this case would have changed. The Division provided defendant with reasonable educational services to help her obtain her GED and she ultimately obtained employment. The record contains no credible evidence to support the claim that additional services to accommodate defendant's learning disability would have had an effect on her cognitive disability and her related inability to adequately provide for J.R.'s serious medical and emotional needs — the focus in this case.

Appellate counsel also argues that trial counsel was deficient in deciding not to call Dr. Aventente Tamignini, defendant's expert psychologist; in failing to call a different expert with expertise working with cognitively disabled clients; and in failing to object to Dr. Singer's testimony about the details of Dr. Tamignini's report. These claims all lack merit.

In an October 10, 2015 report, which was not admitted into evidence, Dr. Tamignini wrote that although defendant "evidenced the ability to respond affectionately toward[s her son]," she "still demonstrates a lack of stability to provide her son with consistency and continuity. She lacks predictability, reliability, and judgment to guide and supervise her son." Dr.

Tamignini concluded, within a "reasonable degree of psychological certainty," that although defendant had "a willingness and great desire to parent her son," she was "not likely to be able to manage her son's daily challenges." He described J.R. as "an extremely active, young child who needs constant supervision and redirection." He found that defendant "was given opportunities to practice and master the skills of reasonable accepted parenting but was unable to be consistent and meet the challenges of parenting [J.R.]." He recommended that given the "strong bonding" between defendant and J.R., that a "program that allows [defendant] to keep in contact with [J.R.] is highly suggested." Of note, he did not recommend full custody for defendant.

On November 6, 2015, trial counsel sent a copy of Dr. Tamignini's report to Dr. Jacobsen, defendant's therapist, and represented that he intended "to use this report and Dr. Tamignini as a witness despite his conclusion. Not using the report/testimony would result in Judge Farber assuming that my expert had an even more negative finding."

In an updated report dated November 25, 2015, Dr. Jacobsen did not discuss Dr. Tamignini's proposal for defendant to have continued contact with J.R.; instead, Dr. Jacobsen stated defendant was "insightful regarding the fact that if she were to regain custody of [J.R.] she would likely find it stressful and

overwhelming, she is consistent in stating that she would need supports in order to regain custody and parent him in the future." Dr. Jacobsen expressed concern that

> the level and duration of the support that [defendant] may need in order to develop the skills to balance her responsibilities for her home, work and parenting responsibilities, to develop a deeper understanding of [J.R.'s] day to day needs, and to increase her emotional resources and social supports may be much more extensive and long-term in duration than is possible or practical for social service agencies to provide. In addition, [defendant] has historically found it difficult to reach out to agencies supporting her when she finds herself overwhelmed, and she instead has become defensive about problems and has looked to unhealthy solutions to cope with her distress.

Meanwhile, defendant's trial counsel wrote the following cryptic message regarding a November 20, 2015 phone conversation he had with Dr. Tamignini: "Someone monitor her everyday. Not testify[.] Not submit report." On November 23, 2015, defendant's trial counsel confirmed he would not call Dr. Tamignini to testify.

When the guardianship trial resumed in December 2015, Dr. Singer, who had completed an updated bonding and psychological evaluation, opined that despite receiving additional time and services, defendant was still not a viable parent for J.R. While Dr. Singer mentioned that he had reviewed Dr. Tamignini's psychological evaluation report, he did not make any further

reference to the report, nor did he disclose any of Dr. Tamignini's opinions. Dr. Singer did testify that he agreed with Dr. Jacobsen's conclusions as set forth in her updated report above.

We conclude the decision not to call Dr. Tamignini as a witness was not deficient because, as counsel's note confirmed, it was not helpful to defendant's case. At best, Dr. Tamignini appears to have recommended some sort of open adoption by the resource parent.

We further conclude defendant was not deprived of the effective assistance of counsel "through the improper use" of Dr. Tamignini's report. State v. Spencer, 319 N.J. Super. 284 (App. Div. 1999), as cited by defendant, is distinguishable. In Spencer, we held that the State's improper cross examination of a defense expert about the opinion of a prior defense expert who did not testify at trial and whose opinion was consistent with the State's expert, "had the clear capacity to unfairly tip the scales in favor of the State, particularly in light of the prosecutor's summation[.]" Id. at 300. Unlike Spencer, here a judge, not a jury, decided the matter under review. Dr. Singer also did not testify as to the contents of Dr. Tamignini's report, nor did the judge refer to the report in his opinion. The judge's brief mention of the report did not change the outcome of this case.

Appellate counsel further argues that trial counsel should

have retained a different expert with experience treating cognitively limited individuals. In support of this argument, counsel provided a report from Dr. Jeffrey B. Allen, a psychologist. Counsel contends that Dr. Allen would have testified that defendant had the capacity to independently parent J.R. However, Dr. Allen found that in order to do so, defendant would need services the Division had already provided to no avail, including instruction in a practical hands-on manner, tutoring with written instructions, and parenting skills training. Thus any deficiency would not have changed the outcome of this case.

Lastly, appellate counsel argues that defendant's trial counsel was deficient in failing to advocate for services to accommodate defendant's cognitive disability consistent with the guidelines set forth by HHS and DOJ.[3] We disagree.

We have explicitly rejected the argument that the Americans

---

[3] In August 2015 (during the first part of the guardianship trial), HHS and DOJ issued joint technical assistance to guide state and local welfare agencies and courts "to ensure that the welfare of children and families is protected in a manner that also protects the civil rights of parent[.]" United States Department of Health and Human Services, Office for Civil Rights Administration for Children and Families, and United States Department of Justice Civil Rights Division Disability Rights Section, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act 1,1 (Aug. 2015) https://www.hhs.gov/sites/default/files/disability.pdf.

with Disabilities Act (ADA), 42 U.S.C.A., §§ 12101 to -12213 (2000) provides a defense to the termination of a parent's rights. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 442 (App. Div. 2001), certif. denied, 171 N.J. 44 (2002). In A.G. we rejected a parent's argument that the failure to reasonably accommodate a parent's mental disability amounted to discrimination under the ADA, reasoning that "to allow the provisions of the ADA to constitute a defense to a termination proceeding would improperly elevate the rights of the parent above those of the child. . . . The fact that A.G. suffers from a mental disorder should not distract us from determining the best interests of the child." Ibid.

In any event, even if deficient, the failure to direct the trial court's attention to this document did not change the outcome of this case. The record contains ample evidence the Division provided defendant with services that were directly geared toward her cognitive limitations, including extensive individual therapy and instructions on life skills with Dr. Jacobsen, supervised visitation, parenting classes, and assistance in basic parenting skills by the Division caseworkers. Defendant's claim she received ineffective assistance of counsel lacks substantive merit.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2850-15T4